**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSE ELIEZER MARTINEZ-ANDINO,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Civil Action No. 26-1208 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Plaintiff Jose Eliezer Martinez-Andino, who is an immigrant from Honduras with no criminal history, but with a three-year old U.S. citizen daughter dependent on the authorization he held to work legally in the United States, Am. Compl. ¶¶ 22-23, ECF No. 19, was removed from this country in a manner that "boggles the mind," Hr'g Tr. (Apr. 10, 2026) at 10:17, ECF No. 17. After being arrested and detained in Montana by immigration authorities and moved between at least six detention centers in different States across the country, Pl.'s Aff. at 1, ECF No. 13-1, he seemingly disappeared—he was not permitted to contact his attorneys for more than ten days, and neither Immigration and Customs Enforcement ("ICE") nor Customs and Border Protection ("CBP") would tell his attorneys where he was or in which agency's custody, despite repeated requests, Am. Compl. ¶¶ 29-31.  Not until his attorneys filed this lawsuit, initially seeking only a temporary restraining order ("TRO") directing defendants to tell them where and in whose custody plaintiff was located, *see* Compl., ECF No. 1; Pl.'s First Emergency Mot. for TRO ("Pl.'s First TRO Mot."), ECF No. 2, did the government disclose that he had been removed to Honduras that same day, purportedly because he had voluntarily agreed to that departure, Hr'g Tr. at 5:1-3, 7:22-23; *see also* Am. Compl, Ex. A, Email from Defs.' Counsel to Pl.'s Counsel (Apr. 10, 2026, at 3:29

1

PM), ECF No. 19-1.[1]  Disputing defendants' characterization of the voluntariness of his removal from the United States, plaintiff alleges that his agreement to removal was neither knowing nor voluntary, Am. Compl. ¶ 63, and that his removal occurred after his repeated requests to speak to counsel were denied and his repeated attempts to revoke any signed documents were also denied, *id.* ¶ 43—to which serious allegations defendants neither proffer nor supply any evidentiary response.  As a result, plaintiff claims that his removal resulted from the government violating the Fifth Amendment, the Administrative Procedure Act ("APA"), and Immigrations and Customs Enforcement's ("ICE") own regulations by depriving him of counsel and his counsel of access to him and by depriving him of any legitimate process prior to removal other than his allegedly infirm agreement to removal, *id.* ¶¶ 63, 70-81.

As ultimate relief, he seeks mandamus directing that defendants undo this harm by facilitating his return to the United States, paroling him into the country out of detention, and reinstating the deferred action status he had prior to his removal, as well as a declaratory judgment that defendants violated his right to counsel and a permanent injunction barring further interference with his rights.  *Id.* at 18-19 (Prayer for Relief).  More urgently, plaintiff seeks a TRO directing defendants to facilitate his return to this country and to parole him here.  Pl.'s Second Mot. for TRO ("Pl.'s Second TRO Mot."), ECF No. 8.  Meanwhile, defendants move to dismiss the Amended Complaint in full.  Defs.' Mot. to Dismiss ("Defs.' MTD"), ECF Nos. 21, 23 (Errata).

For the reasons explained below, defendants' motion to dismiss is **GRANTED IN PART**, as to naming as a defendant Acting Attorney General Todd Blanch, as to plaintiff's APA claim, and his claim based on defendants' alleged violations of 8 C.F.R. § 292.5, and **DENIED IN PART** as

---

[1]    As defendants, plaintiff names the Department of Homeland Security ("DHS"), the DHS Secretary, the Acting Director of ICE, the Acting Executive Associate Director of ICE's Enforcement and Removal Operations, the Commissioner of CBP, the Chief of CBP, and the Acting Attorney General.  *See* Am. Compl. at 1.

to plaintiff's claims alleging violations of the Fifth Amendment and ICE's Performance-Based National Detention Standards ("PBNDS"). Since plaintiff has shown a likelihood of success on his claims that his removal was caused by violations of his Fifth Amendment right to due process, and he has satisfied the other requirements for a TRO, plaintiff's second motion for a TRO is **GRANTED IN PART** and defendants are ordered immediately to facilitate plaintiff's return to the United States "to ensure that his case is handled as it would have been had he not been improperly sent to" Honduras. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). Plaintiff's motion is **DENIED IN PART** to the extent the relief he seeks is moot and to the extent he seeks an order directing the Secretary of the Department of Homeland Security, upon plaintiff's return to the United States, to exercise a discretionary power to parole plaintiff into the country outside of detention.

## I.    BACKGROUND

For the purposes of assessing defendants' motion to dismiss, the facts as stated in plaintiff's Amended Complaint are summarized next, along with the procedural history of this matter.

### A.  Factual Background

Martinez-Andino is a Honduran citizen who entered the United States on or around September 12, 2020, when he was fourteen years old, by crossing the United States/Mexico border in Texas. Am. Compl. ¶ 19. Deemed "to be an unaccompanied minor child," he was "placed in immigration removal proceedings" immediately thereafter. *Id.* ¶¶ 19-20; Compl., Ex. D, Notice to Appear (Sept. 11, 2020), ECF No. 1-2 at 11. In July 2023, an immigration court "granted dismissal of removal proceedings upon joint motion by [plaintiff] and the U.S. Department of Homeland Security," noting that plaintiff had "an approved I-360 Application for Special Immigrant Juvenile Status and intends to file . . . [an application] to become a lawful permanent

resident." Am. Compl. ¶ 21. "Special Immigrant Juvenile" ("SIJ") is a statutorily defined category encompassing certain individuals under 21 years old who are present in the United States and whom a state court has found cannot be returned to their parents or home country due to abuse, neglect, or abandonment. 8 U.S.C. § 1101(a)(27)(J); *see also* U.S. Citizenship and Immigration Serv. ("USCIS"), *Special Immigrant Juveniles*, https://www.uscis.gov/working-in-US/eb4/SIJ [https://perma.cc/P5EM-FBD5]. Individuals with SIJ status may apply for lawful permanent residency, 8 U.S.C. § 1255(h), though this process may take several years, since applications for lawful permanent residency are reviewed on a rolling basis based on the date when the SIJ status was approved, Am. Compl. ¶ 21. Since 2022, the government has offered deferred action (*i.e.*, withholding of removal) to individuals with SIJ status, along with employment authorization. *See* USCIS, *Special Immigrant Juveniles*.[2]

On March 18, 2026, plaintiff was arrested by immigration officials "and detained at the Cascade County Jail in Montana." Am. Compl. ¶ 24. Plaintiff's relatives contacted his current counsel, but the online ICE Detainee Locator showed no information about plaintiff. Compl., Ex. A, Decl. of Alison T. Chan, Pl.'s Counsel ("Chan Decl.") ¶ 2, ECF No. 1-2 at 1. Five days later, on March 23, 2026, while still in the jail, plaintiff called attorney Allison Chan. *Id.* ¶ 3; Am. Compl. ¶ 25. In that call, plaintiff communicated that he had "sign[ed] documents he did not fully understand," which he characterized as "removal paperwork," although he was "unable to articulate to [Chan] what documents he signed." Am. Compl. ¶ 25.[3] On March 31, plaintiff's

---

[2] On June 6, 2025, USCIS rescinded the deferred action policy for SIJ status, though the change left in place deferred action for those individuals, like plaintiff, already holding that status. *Id.*

[3] Defendants' motion to dismiss, docketed on May 20, 2026, includes as attachments two forms bearing plaintiff's signature, which plaintiff attests was not voluntarily and knowingly affixed: (1) a single page DHS Form I-826, titled "Notice of Rights and Request for Disposition," in Spanish, with plaintiff's signature next to the typewritten date "03/18/2026"—the same date as his arrest and detention—with the redacted name of an "Immigration Officer," next to a different typed date "March 19, 2026 10:08 AM," *see* Defs.' MTD, Ex. A, Pl.'s I-826 Form, ECF No. 21-1; and (2) a four-page DHS Form I-210, confirming receipt of plaintiff's agreement to removal (*i.e.*, the I-826 form),

counsel was retained by plaintiff's family and entered a notice of appearance with ICE, since "CBP . . . informed Counsel that the Plaintiff [was] transferred to ICE custody on or about March 31, 2026." *Id.* ¶¶ 27-28; *cf.* Chan Decl. ¶ 9 ("On March 31, 2026, Cascade County Jail confirmed to me by phone that Mr. Martinez Andino was transferred to ICE custody on March 28, 2026.").

Between March 31 and April 10, plaintiff's counsel contacted ICE and CBP multiple times to obtain information as to plaintiff's location and which agency had custody of plaintiff. Am. Compl. ¶ 29. Both ICE and CBP denied having custody of plaintiff. *Id.* ¶ 30. CBP asserted that ICE had taken custody of him on March 30 or 31, whereas ICE denied having ever taken custody of him. *Id.* During this ten-day period, neither ICE or CBP would confirm plaintiff's physical whereabouts or put counsel in touch with him directly. *Id.* ¶ 36. Plaintiff's family also did not hear from him after "the weekend of March 28," *id.* ¶ 37.

## B. Procedural History

On Friday, April 10, 2026, after at least 10 days of not hearing from plaintiff and being denied information by defendants as to plaintiff's whereabouts or custodial status, plaintiff's counsel initiated this action, filing the complaint and an accompanying motion for temporary restraining order at approximately 11:30 AM on April 10, 2026. *See* Compl.; Pl.'s First TRO Mot. As relief, plaintiff sought an order directing defendants to (1) disclose plaintiff's "current physical location"; (2) "identify the agency currently exercising custody" over plaintiff; and (3) "provide Plaintiff with immediate access to counsel." Pl.'s First TRO Proposed Order at 1-2, ECF No. 2-1. The original complaint also contained a petition for a writ of habeas corpus. Compl. ¶¶ 53-55.

---

dated "March 19, 2026"—the next date after plaintiff's arrest and detention—and affirming that DHS has "granted voluntary departure," requiring plaintiff to depart on or before March 23, 2026, which form has plaintiff's signature next to the handwritten date "3/19/2026," and the redacted name of an "Authorized DHS Official" digitally signed on "2026.03.19 10:36:37," *id.*, Ex. B, Pl.'s I-210 Form, ECF No. 21-2.

The case was assigned to the undersigned at 12:28 PM that same day, and a teleconference TRO hearing was scheduled for 4:00 PM that afternoon. *See* First Minute Order (Apr. 10, 2026). Due to technical difficulties on defendants' counsel's part, the hearing began at 4:07 PM. *See* Hr'g Tr. at 1. At the outset, defendants' counsel stated that plaintiff "flew to Honduras this morning, and the flight that he was on . . . landed in Honduras at 10:50 Honduras time [12:50 EST]," and that plaintiff was "no longer . . . in the custody of any government agency." *Id.* at 5:1-5. Plaintiff's counsel indicated that, prior to that afternoon, they "had no idea he was going to be deported" and expressed that they "don't believe that he could have knowingly and voluntarily signed something if he was being deprived of advice of counsel for over a week." *Id.* at 10:9, 11:23-25.

The Court granted plaintiff's motion for TRO to the extent that motion sought information about plaintiff's custody and location, since defendants had provided that information, and directed that, if still in government custody, plaintiff be provided with access to counsel. Hr'g Tr. at 12:19-24, 14:18-22; Second Minute Order (Apr. 10, 2026). The Court denied the motion "insofar as plaintiff is no longer in the custody of any agency of the U.S. Government," since the request that he be allowed to contact counsel was predicated on his being in U.S. custody. Second Minute Order (Apr. 10, 2026); Hr'g Tr. at 13:2-7.

At approximately 6:00 PM the same Friday, April 10, 2026, plaintiff filed a second motion for a TRO, seeking an order directing defendants to (1) disclose whether plaintiff was still in U.S. custody at the time of the hearing and which agency last had custody or plaintiff; (2) provide plaintiff access to counsel, if plaintiff was still in U.S. custody; (3) "[n]ot . . . release the Plaintiff to the Honduran government or to his liberty in Honduras; (4) "[p]arole Plaintiff back into the United States under 8 C.F.R. § 212.5(d)(5) to rectify his wrongful removal"; and (5) "facilitate his return to the custody of the United States for him to be paroled back to the United States," if

plaintiff was no longer in U.S. custody.  Pl.'s Second TRO Mot. at 3.  The Court directed the government to file, by Monday, April 13, 2026, at 2:00 PM, responses to the factual disclosures sought by plaintiff, with plaintiff's response due the following day.  Third Minute Order (Apr. 10, 2026).

On April 13, 2026, the government filed a response, accompanied by a declaration from Christopher George, the Deputy Assistant Director of the International Operations Division within ICE's Removal Division of Enforcement and Removal Operations.  *See* Defs.' Resp. to Order of the Ct., ECF No. 10; Decl. of ICE Deputy Ass't Dir. Christopher George ("First ICE Decl."), ECF No. 12.  The ICE declaration stated that "at approximately 8:00 AM EST, Martinez-Andino departed the United States via Mesa, Arizona, on a chartered removal flight to Honduras," at which time he was in ICE custody.  First ICE Decl. ¶ 5.  According to ICE, plaintiff landed at "approximately 12:50 PM EST," and "no later than 2:00 PM EST . . . was transferred from ICE custody to the custody of the Government of Honduras[]."  *Id.* ¶ 6.

Later that same day, plaintiff, whom counsel had apparently been able to contact in Honduras, filed an affidavit, stating that "[t]he paperwork [he] signed when [he] was detained was not explained to [him]," and he was "told the only option [he] had in detention was to sign for the paperwork."  Pl.'s Aff. at 1, ECF No. 13-1. He "asked to speak with [his] attorneys for 9 days between March 31 and April 9," which "requests were ignored or denied," and he "told immigration officials that [he] was afraid to return to Honduras and . . . wanted an interview or a hearing with the Judge," which requests were also "ignored or denied."  *Id.*  During his U.S. detention, he "felt terribly mistreated," due to poor food and no access to showers.  *Id.*  Plaintiff also recounted a timeline of removal quite different from that offered by defendants, either through defendants' counsel at the TRO hearing held the afternoon of Friday, April 10 or in the ICE

Declaration filed on Monday, April 13.  According to plaintiff, he landed in Honduras "around 2:00 p.m. (Honduras time)" (4:00 PM EST) on April 10, after which he "spent about 2 hours on the plane." *Id.*  "It was about 4:00 p.m. (Honduras time) [6:00 PM EST] when [they] first started to go through immigration in Honduras," and plaintiff "remember[s] the time because [they] asked what time it was when [they] landed, and then [they] asked what time it was when [they] got off the plane." *Id.*  Plaintiff believes "it took about 1.5 hours to go be processed by Honduran officials," placing the time of processing at around 7:30 PM EST.  *Id.*  Plaintiff is "afraid to be . . . in Honduras" because he "suffered a lot of physical abuse by [his] father when [he] was a child" and "still ha[s] scars on [his] body from what [his] father did to [him]." *Id.* at 2.[4]

Given the apparent factual conflicts and concomitant legal issues as to the legal viability of plaintiff's claims and relief sought, the parties were directed to propose a briefing schedule, Minute Order (Apr. 14, 2026), which proposal was adopted, Minute Order (Apr. 15, 2026); *see also* Jt. Status Report, ECF No. 16  (proposing schedule for plaintiff's filing of any amended complaint or amended TRO or preliminary injunction ("PI") motion, for defendants' filing of a motion to dismiss, and for briefing to be completed by June 17, 2026, on both motions).

Plaintiff subsequently filed the operative Amended Complaint, *see* Am. Compl., without any amended TRO or PI motion.[5]  The Amended Complaint contains five claims for relief: (1)

---

[4]    Plaintiff appears to be at liberty in Honduras.  *See* Pl.'s Second TRO Mot. (seeking facilitation of his return without mentioning that he needs to first be released from Honduran custody); Pl.'s MTD Opp'n at 13 ("Plaintiff has been dumped into San Pedro Sula, Honduras.").

[5]    Defendants argue, without citation to any authority, that the filing of the Amended Complaint renders plaintiff's prior-filed second pending TRO request moot, Defs.' MTD at 14-15, but this is incorrect.  A motion to dismiss the complaint is mooted automatically by the filing of an amended complaint as of right, *Barnes v. Dist. of Columbia*, 42 F. Supp. 3d 111, 117 (D.D.C. 2014), since such motions to dismiss are directed at the complaint itself and therefore cannot be evaluated when the original complaint has been superseded and is no longer the operative pleading.  In contrast, here, plaintiff's second TRO motion is fully amenable to evaluation, even with the original complaint superseded—indeed, as defendants note, the Amended Complaint provides the factual allegations necessary to evaluate the second TRO motion.  Defs.' MTD at 15.

pursuant to the Mandamus Act, 28 U.S.C. § 1361, due to defendant's breach of "duty to maintain accurate custody information and permit attorney access," *id.* ¶¶ 64-69 (Count I, Mandamus); (2) for violation of the Administrative Procedure Act, 5 U.S.C. § 706(1), since defendants "unlawfully withheld agency action by failing to disclose Plaintiff's location and permit access to counsel while he was under the custody of the agency," *id.* ¶¶ 70-72 (Count II, APA); (3) for violation of the Fifth Amendment, due to defendants' interference with plaintiff's "access to counsel," *id.* ¶¶ 73-76 (Count III, Fifth Amendment); (4) for violation of the *Accardi* doctrine, which requires agencies to comply with their own regulations, *id.* ¶¶ 77-81 (Count IV, *Accardi* doctrine); and (5) pursuant to the All Writs Act, 28 U.S.C. § 1651, in the form of "[a]n order compelling the facilitation of Plaintiff's return . . . to restore the Court's jurisdiction," *id.* ¶¶ 82-87 (Count V, All Writs Act).  As relief, plaintiff seeks (1) a declaratory judgment that defendants' denial of plaintiff's access to counsel, obtaining plaintiff's agreement to removal "through coercive tactics," and removing plaintiff from the United States "violated the Fifth Amendment, the APA, and the *Accardi* doctrine," (2) a writ of mandamus directing defendants to "facilitate" plaintiff's return to the United States, "issu[e] humanitarian parole travel documents under 8 C.F.R. § 212.5 to allow for admission into the United States," and "provid[e] for the cost of Plaintiff's return flight to the United States," (3) vacatur of plaintiff's removal and restoration of his deferred action status; (4) a permanent injunction prohibiting interference by defendants with plaintiff's right to counsel or right to seek adjustment of status; and (5) attorneys' fees.  *Id.* at 18-19 (Prayer for Relief).[6]

Defendants have now moved to dismiss the Amended Complaint for lack of subject-matter jurisdiction and failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and

---

[6]     Plaintiff is no longer in U.S. government custody, and thus, the Amended Complaint drops the habeas claim set out in the original complaint.

(b)(6).  *See* Defs.' MTD.  Attached to this motion is a second declaration by the same ICE official correcting his prior declaration.  Second Decl. of Christopher George ("Second ICE Decl.") ¶¶ 5-7, ECF No. 23-3.  Specifically, the Second ICE declaration states that the declarant "discovered that the times as reported in the records [he] used to prepare for [his first] declaration were reported in local time in Honduras, not Eastern Standard Time as [he] originally believed," and, with the correct time zones, that plaintiff "departed the United States" "in ICE custody" on April 10, 2026, at "approximately 10:00 AM EST," landed in Honduras at "approximately 2:50 PM EST," and "all aliens on the removal flight were confirmed as handed over to the custody of the Government of Honduras[] . . . by 4:10 PM EST"—which is ten minutes into the scheduled hearing time on April 10 and approximately three minutes after the April 10 hearing actually began.[7]

Also attached to defendants' motion are two forms, DHS Form I-826 and Form I-210, which reflect plaintiff's signature on the day of and the morning after his initial arrest and detention in a Montana jail, and on which defendants base their assertion that plaintiff was voluntarily deported. *See supra* n.3 (describing Defs.' MTD, Ex. A, Pl.'s I-826 Form, ECF No. 21-1, and Ex. B, Pl.'s I-210 Form, ECF No. 21-2).  The DHS Form I-826 states, *inter alia*, that "[y]ou have the right to contact an attorney or other legal representative," and outlines three options for disposition of an immigration case: (1) "I request a hearing before the Immigration Court to determine whether or not I may remain in the United States"; (2) "I believe I face harm if I return to my country.  My case will be referred to the Immigration Court for a hearing"; and (3) "I admit that I am in the United States illegally, and I believe I do not face harm if I return to my country.  I give up my

---

[7]     The parties devote significant briefing to which accounting of this timeline is correct, whether the government's initial, erroneous timeline was provided to the Court in bad faith, and whether defendants "engineered their own mootness defense" by "completing Plaintiff's removal during the pendency of this action," *see* Pl.'s MTD Opp'n at 11; *see also id.* at 3-5; Defs.' MTD at 8-10; Defs.' MTD Reply at 2-8.  Since neither jurisdiction nor plaintiff's claims appear to hinge on the precise timeline of plaintiff's removal relative to the first TRO hearing in this matter, these disputes are not resolved or further addressed at this time.

right to a hearing before the Immigration Court. I wish to return to my country as soon as arrangements can be made to effect my departure. I understand that I may be held in detention until my departure." Pl.'s I-826 Form. Notably, the form states, "If you choose to return to your country, you may change your mind and request a hearing before an immigration judge at any time before your departure from the United States. You must immediately notify an immigration officer if you change your mind." *Id.* The copy of the form provided by defendants shows plaintiff's initials next to the third option ("I wish to return to my country . . ."), and his signature, with the typewritten date, "03/18/2026." The bottom of the form has checked boxes for the Notice was "read by subject" and "read to subject by [redacted name] in the Spanish language," followed by the redacted name in a digital signature of an "Immigration Officer" affixed at "2026.03.19 10:10:41" with the letters "CBP," and the typewritten date "March 19, 2026 10:08 AM." *Id.*

The second form submitted by defendants, DHS Form I-210, confirms receipt by DHS of plaintiff's agreement to removal (*i.e.*, the I-826 form), and affirms that DHS has "granted voluntary departure," requiring plaintiff to depart "on or before March 23, 2026." Pl.'s I-210 Form. Plaintiff's handwritten signature appears next to the handwritten date, "3/19/2026." *Id.* The addendum to this form also bears plaintiff's handwritten signature, next to the handwritten date, "3/19/2026," under the text, stating, in part, "I hereby knowingly, voluntarily, and intelligently waive my opportunity to file any and all applications for relief or protection from removal, deportation, or exclusion under the immigration laws. I acknowledge that I do not have a fear of return to my country." *Id.* The Form I-210 and addendum are both in English, with the addendum stating that "[t]he alien was provided an oral interpretation/written translation of this Declaration in the alien's preferred language," above the digital signature of a redacted name, digitally signed "2026.03.19 10:40:28," by a "Supervisory Border Patrol Agent." *Id.* In short, these forms indicate

that between about 10:08 AM and 10:40 AM on March 19, 2026, the morning after plaintiff was picked up and detained in a Montana jail, and before finding, consulting with, and retaining counsel, plaintiff had executed DHS forms volunteering to leave the United States.

Briefing on both plaintiff's second TRO motion and defendants' motion to dismiss became ripe for resolution on June 17, 2026, in accordance with the schedule proposed by parties and adopted by the Court. *See* Minute Order (Apr. 15, 2026).

## II.   APPLICABLE LEGAL STANDARDS

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

"Article III of the Constitution prescribes that '[f]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'" *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)); *see also Gunn v. Minton,* 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))). Federal courts therefore have a corresponding "independent obligation to ensure that they do not exceed the scope of their jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). Absent subject-matter jurisdiction over a case, the court must dismiss it. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); FED. R. CIV. P. 12(h)(3).

To survive a motion to dismiss for lack of subject matter jurisdiction, under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over the claim at issue. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

12

The court resolves jurisdictional questions by accepting as true all uncontroverted material factual allegations contained in the complaint and "constru[ing] the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (second alteration in original) (internal quotation marks omitted) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). Inferences drawn by the plaintiffs need not be accepted, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *Id.* at 288 (noting that liberally construing complaint in plaintiffs' favor "does not entail accepting inferences unsupported by facts or legal conclusions cast in the form of factual allegations" (alterations accepted and internal quotation marks omitted)).  The court "may consider materials outside the pleadings" in assessing whether subject matter jurisdiction may be exercised. *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B.  Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" although the allegations need not be "detailed." *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The alleged facts must not be "'merely consistent with' a defendant's liability" but rather must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). All factual allegations in the complaint must be accepted as true, "even if doubtful in fact," *Twombly*, 550 U.S. at 555, though the court does "not assume the truth of legal conclusions, nor . . . 'accept inferences that are unsupported by the facts set out in the complaint,'" *Arpaio*, 797

13

F.3d at 19 (citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

In assessing the sufficiency of a complaint under Rule 12(b)(6), a court's consideration is limited "to materials properly before it," including, in this Circuit, "'the facts alleged in the complaint, [and] documents attached thereto or incorporated therein.'" *Page v. Comey*, 137 F.4th 806, 813 (D.C. Cir. 2025) (alteration in original) (quoting *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting that, in deciding motion to dismiss, consideration may be given to "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice").

### C. Temporary Restraining Order

Much like a preliminary injunction, a temporary restraining order is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)). "The standard for obtaining either a TRO or a preliminary injunction is identical." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025) (citing *Gordon v. Holder*, 632 F.3d 722, 723-24 (D.C. Cir. 2011)). Thus, to obtain a temporary restraining order "the movant must show: (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Hanson v. Dist. of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see Gordon*, 632 F.3d at 723-24 (applying the preliminary injunction standard to review a district court decision

denying a motion for a temporary restraining order and preliminary injunction). "The balance of the equities weighs the harm to [plaintiff] if there is no injunction against the harm to [defendants] if there is," and, when the government opposes the preliminary injunction, "the [government]'s harm and the public interest are one and the same, because the government's interest *is* the public interest," so the third and fourth factors merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).

While the standard is the same for a TRO and a preliminary injunction, other aspects of these two forms of emergency relief differ. Specifically, a "TRO often is used to provide immediate relief upon the filing of a lawsuit and may be issued without notice to the adverse party," *Dellinger*, 2025 WL 559669, at *3 (citing FED. R. CIV. P. 65(b)(1)), and "'expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension,'" *id.* (quoting FED. R. CIV. P. 65(b)(2)), beyond which "timeframe of a TRO, the district court may grant a preliminary injunction to provide relief that extends until the lawsuit is resolved," *id.*

## III.   DISCUSSION

Defendants move for dismissal on several grounds, which are discussed first before turning to the merits of plaintiff's request for a temporary restraining order based on the surviving claims.

### A.  Defendants' Motion to Dismiss

Defendants claim that the Amended Complaint must be dismissed on the following four grounds: (1) improperly naming the Acting Attorney General as a defendant, (2) mootness, (3) lack of standing, and (4) failing to state a claim under the *Accardi* doctrine, each of which is addressed *seriatim*.

### 1. Naming Acting Attorney General as Defendant

Defendants argue that, though plaintiff "named Acting Attorney General Todd Blanche as a defendant in this lawsuit," plaintiff "does not allege any wrongdoing by the Department of Justice," and therefore Blanche should be dismissed as a defendant. Defs.' MTD at 13. Plaintiff fails to address this argument, essentially conceding the point. *See* D.D.C. Local Civil Rule 7(b) (unopposed motions may be "treat[ed] . . . as conceded"); *FDIC v. Bender*, 127 F.3d 58, 68 (D.C. Cir. 1997) ("Where the district court relies on the absence of a response as a basis for treating the motion as conceded, [the Circuit] honor[s] its enforcement of the rule." (internal quotation marks omitted) (quoting *Twelve John Does v. Dist. of Columbia*, 117 F.3d 571, 577 (D.C. Cir. 1997)); *Uranga v. U.S. Citizenship & Immigr. Servs.*, 490 F. Supp. 3d 86 (D.D.C. 2020) ("[I]t is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." (quoting *CD Int'l Enters., Inc. v. Rockwell Cap. Partners, Inc.*, 251 F. Supp. 3d 39, 46 (D.D.C. 2017))). Thus, defendants' motion to dismiss Blanche as defendant is granted, and all claims are dismissed as to Blanche.

### 2. Mootness of Plaintiff's Claims

Defendants contend that mootness dooms all plaintiff's claims.[8] "It has long been settled that a federal court has no authority 'to give opinions upon moot questions.'" *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). A controversy is moot "when the issues presented are no longer 'live' or the parties

---

[8]    Defendants also argue that certain relief sought in the second TRO is moot because the relief has already been provided, *see* Defs.' MTD at 30 (describing as moot plaintiff's requested relief in the form of information about the timeline of plaintiff's removal and his access to counsel, and for plaintiff not to be released from U.S. custody), but this focus on relief has no bearing on defendants' motion to dismiss the Amended Complaint. The relief requested in the TRO that is available is discussed *infra* in Part III.B.

lack a legally cognizable interest in the outcome." *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  Analysis of each claim shows this mootness challenge does not pass muster, except as to the APA claim in Count II.

### (a) Count I (Mandamus)

Count I, seeking relief pursuant to the Mandamus Act, 28 U.S.C. § 1361, is not moot, since that count seeks a forward-looking remedy for the legal violations alleged in other substantive claims in the Amended Complaint.  *See* Am. Compl. ¶¶ 64-69.  Plaintiff's Prayer for Relief reveals that plaintiff relies on the mandamus writ not to direct defendants to disclose plaintiff's location or allow him access to counsel, which relief plaintiff has already obtained, but to "facilitate" plaintiff's return to the United States, "issu[e] humanitarian parole travel documents under 8 C.F.R. § 212.5 to allow for admission into the United States," and "provid[e] for the cost of Plaintiff's return flight to the United States."  *Id*. at 18 (Prayer for Relief).  In other words, plaintiff argues that because defendants breached clear duties under the Fifth Amendment, APA, and *Accardi* doctrine, as set out in the causes of action in Counts II, III, and IV, respectively, *see* Am. Compl. ¶¶ 70-81, by failing to provide plaintiff access to counsel and plaintiff's counsel access to information about plaintiff's custody status, plaintiff is entitled to mandamus ordering defendants to correct the resultant effects of those breaches, including his detention, removal, and revocation of deferred action, see Am. Compl. at 18 (Prayer for Relief).   Setting aside the merits of this request for mandamus, plaintiff has a cognizable and continuing interest that is not moot in directing defendants to return him to the United States, and Count I is accordingly not moot.

### (b) Count II (APA Claim Under 5 U.S.C. § 706(1))

Plaintiff's claim for relief, pursuant to the APA, 5 U.S.C. § 706(1), is moot, because the only relief available under § 706(1) is an order "compel[ling] agency action unlawfully withheld

or unreasonably delayed," 5 U.S.C. § 706(1), but the only agency actions alleged to be unreasonably delayed are "disclos[ure] [of] Plaintiff's location" and "permit[ting] access to counsel," Am. Compl. ¶ 70. Since defendants have now taken both actions plaintiff claims they unreasonably delayed, no more relief is available for plaintiff to seek under § 706(1). *Mehneh v. Rubio*, 164 F.4th 928, 931 (D.C. Cir. 2026) (claim under § 706(1) moot when allegedly delayed action was completed by agency during pendency of litigation). As such, Count II, as alleged, is moot and dismissed.

### (c) Count III (Fifth Amendment)

Defendants do not dispute that noncitizens have a constitutional, Fifth Amendment right to the advice of counsel, nor do they offer any explanation why plaintiff was denied access to his counsel for the ten days immediately prior to his removal. *See generally* Defs.' MTD; *see also infra* Part III.B.1(a) (discussing the rights to due process and counsel in immigration proceedings). Instead, defendants argue, first, "there is no further relief for the Court to grant" on plaintiff's Fifth Amendment claim, based on denial of access to counsel, since plaintiff "indisputably has access to counsel" now, Defs.' MTD at 19; and second, that "voluntary departure from the country moots claims about immigration detention," *id.* at 20. Neither argument renders plaintiff's claim moot.

First, while plaintiff could not, and does not, ask for an order turning back time to provide him with counsel and due process prior to his April 10, 2026, removal, he can and does seek forward-looking relief—namely, that defendants be ordered to undo the harmful *effects* of this alleged deprivation of rights by undoing plaintiff's resultant removal from the country. *See* Am. Compl. at 18-19 (Prayer for Relief). This comports with the remedies usually offered when someone is deprived of counsel in circumstances entitling them to counsel or is otherwise deprived of due process: reversal of the detrimental action against them with the opportunity to receive the

18

process they were due. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (holding that "erroneous deprivation of the right to counsel of choice . . . qualifies as structural error" requiring reversal of criminal conviction (internal quotation marks omitted)); *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932) (reversing conviction when "defendants were not accorded the right of counsel"); *cf. Nken v. Holder*, 556 U.S. 418, 434-35 (2009) ("Aliens who are removed may continue to pursue their petitions for review [of their removal], and those who prevail can be afforded effective relief by facilitation of their return," though in some cases a stay of removal may be appropriate when the alien shows "irreparable harm" from even temporary removal); *see also infra* Part III.B.1(b) (collecting cases in which procedurally deficient removals were remedied by ordering the return of the individual to the United States).[9]  Regardless of the merits of plaintiff's Fifth Amendment claim, the remedy sought by plaintiff would correct, at least in part, a consequence of the deprivation of a constitutional right he allegedly suffered.

Second, even assuming, *arguendo*, as correct defendants' sweeping statement that "voluntary departure from this country moots claims about immigration detention"—which is supported by citation to only out-of-circuit, unreported district court opinions and no binding precedent, Defs.' MTD at 20 (citing case from the Eastern District of California and two magistrate judge reports and recommendations adopted by District Court Judges in the Northern and Southern Districts of Texas)—plaintiff contests, as a matter of fact and law, whether his departure was voluntary. Am. Compl. ¶ 63. At the motion to dismiss stage, taking plaintiff's allegations as true, defendants' counter-assertion that plaintiff's departure was, in fact, voluntary, cannot be the basis

---

[9]     Defendants quibble with plaintiff's request for a "permanent injunction prohibiting Defendants from further interfering with [his] access to counsel or his right to seek adjustment of status," Am. Compl. at 19 (Prayer for Relief), since plaintiff "is not in immigration custody and fails to show that he will be again." Defs.' MTD at 20-21.  Insofar as plaintiff seeks an order that the U.S. government return him to the United States, the grant of such relief would give plaintiff every reason to believe he would be placed in immigration custody again.  Thus, whether this particular requested relief is moot, as defendants argue, hinges on whether other relief sought by plaintiff is granted.

for finding his claim moot. Put another away, defendants' effort to raise a factual dispute about whether plaintiff's departure was voluntary is irrelevant in evaluating a motion to dismiss when such factual disputes are resolved in favor of plaintiff's allegations and, here, is particularly weak in the face of plaintiff's sworn declaration about defendants' repeated denial of his rights both to counsel and to void the documents he signed, Pl.'s Aff. at 1, and given that those sworn statements remain essentially unrefuted by defendants.

### (d)  Count IV (Accardi *Doctrine*)

Finally, Count IV claims a violation of the *Accardi* doctrine stemming from defendants' alleged violations of "the Performance-Based National Detention Standards (PBNDS) and 8 C.F.R. § 292.5(b), which mandate access to counsel and notification of counsel prior to transfer or removal." Am. Compl. ¶ 79. "Even where Congress has accorded an agency broad discretion, if the agency itself chooses to bind itself to published procedures, this choice means that it must then 'exercise its own discretion' in accordance with its own 'existing valid regulations' and binding precedents." *Castaneira v. Noem*, 138 F.4th 540, 551 (D.C. Cir. 2025) (quoting *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). The *Accardi* doctrine stems from the APA, which "was adopted to provide, *inter alia*, that administrative policies affecting individual rights and obligations be promulgated pursuant to certain stated procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). Consequently, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Id.*; *see also Accardi*, 347 U.S. at 268 (stating that agency compliance with its own regulations ensures that parties are "at least . . . afforded that due process required by the regulations").

20

Defendants argue plaintiff's claims under this doctrine are moot, because they are "about undue delay in providing information about his whereabouts or access to counsel" and therefore are "no longer live now that the Government has provided the requested information regarding Plaintiff's whereabouts, he has been released from custody, and he undisputedly has access to counsel." Defs.' MTD at 17. This is essentially the same argument defendants use to challenge plaintiff's claim in Count II, for relief under the APA, 5 U.S.C. § 706(1). Yet, plaintiff's claim under the *Accardi* doctrine differs from that under § 706(1).

While defendants' alleged violations of 8 C.F.R. § 292.5 and the PBNDS are not ongoing, the injury allegedly caused by these violations is ongoing and could be remedied by the relief plaintiff seeks. In short, plaintiff alleges that 8 C.F.R. § 292.5 and the PBNDS required defendants to allow him access to his attorney but defendants failed to do so, and this failure "resulted in the unlawful removal of" plaintiff from the country. Am. Compl. ¶ 81. Plaintiff's injury is still live because he seeks for defendants to be compelled to redo his removal in compliance with their own internal regulations, and this is exactly the sort of relief available when an agency violates its own procedural rules. *See Accardi*, 347 U.S. at 268 (directing that if plaintiff shows the agency violated its own regulations in adjudicating plaintiff's case, "he should receive a new hearing before the Board without the burden of [the diversion from the agency's procedures]"). Plaintiff has "a legally cognizable interest in the outcome" of his *Accardi* claim, and Count IV is accordingly not moot. *Davis*, 440 U.S. at 631.

***

In sum, only plaintiff's claim in Count II alleging a violation of the APA, 5 U.S.C. § 706(1), is moot, and defendants' mootness challenge to the remaining claims fails.

21

### 3. Plaintiff's Standing

Defendants correctly state that "for a plaintiff to have standing, he must have . . . suffered an injury in fact . . . that is likely to be redressed by a favorable judicial decision," Defs.' MTD at 23 (internal quotation marks omitted) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)), and contend that, here, the claimed injuries are not redressable because plaintiff "does not have a right to reenter the United States, and this Court may not order the relief that he requests," *id.* Three forms of relief sought by plaintiff are, in defendants' view, unavailable to plaintiff and therefore render his claims non-redressable and destroy his standing. Specifically, plaintiff seeks relief in an order directing defendants (1) to "facilitate" plaintiff's return to the United States, including by "providing for the cost of Plaintiff's return flight to the United States," Am. Compl. at 18-19 (Prayer for Relief); (2) to "issu[e] humanitarian parole travel documents under 8 C.F.R. § 212.5 to allow for admission into the United States," *id.*; and (3) to vacate plaintiff's removal and "reinstat[e] Plaintiff's grant of Deferred Action and his prior immigration status," *id.* Defendants contend that plaintiff's alleged injuries are simply not redressable in the form of the requested order to defendants for three interrelated reasons: plaintiff lacks legal authorization to be in the United States, parole into the United States is committed by statute to the discretion of the Executive Branch, and this Court lacks the authority to reinstate plaintiff's deferred action. Defs.' MTD at 23-29.

In some cases, questions of redressability "obviously shade into those determining whether the complaint states a sound basis for equitable relief." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (internal quotation marks omitted). When, for example, a plaintiff seeking an injunction can show "past exposure to illegal conduct" but not "continuing, present adverse effects" of that illegal conduct, a complaint may be dismissed for lack of standing, because plaintiff

22

has failed "to establish the basic requisites of the issuance of equitable relief in these circumstances—the likelihood of substantial and immediate irreparable injury." *O'Shea v. Littleton*, 414 U.S. 488, 495-96, 502 (1974). Similarly, when the effectiveness of redress depends on the actions of individuals "not parties to the suit" who have "no reason [to] be obliged to honor" the relief ordered by the Court, *Murthy v. Missouri*, 603 U.S. 43, 73-74 (2024), or when the relief sought by plaintiff would require the court to intrude on "the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute," *United States v. Texas*, 599 U.S. 670, 677 (2023), a plaintiff's injury may lack the redressability necessary to establish standing. As these examples illustrate, the court's power to issue the relief sought by plaintiff may indeed have implications for a plaintiff's standing. None of these examples describe the circumstances here, however.

Defendants' challenge to plaintiff's standing is predicated solely on their view of the availability, or lack thereof, to the requested relief and, since that view turns out to be incorrect, *see infra* Part III.B.1, this standing challenge also fails. Put another way, plaintiff's claimed injury is likely to be redressed by a favorable judicial decision granting at least part of the requested relief, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992), thereby satisfying the standing requirement of redressability.[10]

---

[10] Defendants imply in their standing argument that this issue raises political questions committed to the discretion of the Executive Branch. *See, e.g.*, Defs.' MTD at 23 ("The Court lacks jurisdiction over plaintiff's complaint because the injunctive relief requested is reserved to the political branches." (capitalization altered)). "[A] controversy 'involves a political question . . . where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it."'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (quoting *Nixon v. United States,* 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr,* 369 U.S. 186, 217 (1962))). Plaintiff's surviving *claims*, under the Fifth Amendment and *Accardi* doctrine, are familiar claims handled by the federal judiciary, not the political branches.

### 4.  Plaintiff States a Claim Under the *Accardi* Doctrine as to the PBNDS

In addition to arguing that plaintiff's *Accardi* doctrine claim is moot, defendants posit that plaintiff "fails to state an *Accardi* claim" based on either 8 C.F.R. § 292.5(b) or under the PBNDS, *see* Defs.' MTD at 18, because (a) "on its face, 8 C.F.R. § 292.5(b) does not apply to plaintiff"; (b) the PBNDS is not a "legislative rule[]" to which *Accardi* applies; and (c) plaintiff "does not establish that there was any discrete final agency decision not to implement" the PBNDS.  *Id.* at 18-19 (internal quotation marks omitted).  Plaintiff counters that 8 C.F.R. § 292.5(b) and the PBNDS are each applicable and enforceable, and that defendants violated those regulations by depriving him of access to counsel for ten days prior to his removal resulting in significant prejudice to him.  *See* Pl.'s MTD Opp'n at 7.

### (a)  8 C.F.R. § 292.5(b)

Defendants are correct that 8 C.F.R. § 292.5(b), a DHS regulation, is inapplicable here. Section 292.5(b) provides:

> "[w]henever an examination is provided for in this chapter, the person involved shall have the right to be represented by an attorney or representative who shall be permitted to examine or cross-examine such person and witnesses, to introduce evidence, to make objections which shall be stated succinctly and entered on the record, and to submit briefs."

8 C.F.R. § 292.5(b).  Although no definition of "examination" is provided in the regulation's Chapter I, *i.e.* "this chapter," or Title 8 of the Code of Federal Regulations, in which Chapter I is situated, context confirms that the referenced "examination," which is "provided for in this chapter," occurs when (1) "[a]pplication to lawfully enter the United States . . . [is] made in person to an immigration offer at a U.S. port-of-entry when the port is open for inspection," *see* 8 C.F.R. § 235.1 (titled "Scope of Examination"), and (2) "[s]ubsequent to the filing of an application for naturalization," *see id.* § 335.2(a) (titled "Examination of Applicant").  Plaintiff points to no provision characterizing the signing of a voluntary departure form as an "examination" as this term

24

is used in § 292.5(b), nor has plaintiff explained anywhere in briefing, including in response to defendants' motion to dismiss, why this provision applies under the circumstances of his detention prior to removal.  Plaintiff has thus failed to state a claim under this provision and Count III is dismissed to the extent this claim relies on 8 C.F.R. § 292.5(b).

*(b) Performance-Based National Detention Standards (PBNDS)*

In addition to 8 C.F.R. § 292.5(b), plaintiff cites the PBNDS, an ICE publication promulgated to "ensure the due process, health, safety, and security of all individuals in custody." ICE, *Performance-Based National Detention Standards* ("*PBNDS*") at 2 (2026), https://www.ice.gov/doclib/detention-standards/2026/nds2026.pdf    [https://perma.cc/29YQ-4S2U].  Plaintiff does not specify a particular section of the PBNDS on which he relies, but several sections stand out as possibilities.  Standard 5.5 provides multiple standards regarding access to counsel, including that "attorneys and other legal representatives" "may visit detainees to discuss legal matters," and that "[p]rivate consultation rooms shall be available for these meetings," *PBNDS* 5.5(II)(G)(3), (7); such facilities "shall permit legal visitation seven days a week" "for a minimum of eight hours per day on regular business days," *id.* 5.5(II)(G)(2); and "[t]he facility shall make a good-faith effort to locate a detainee" when a "legal service provider" inquires about them, *id.* 5.5(II)(G)(5).  "Even if telephone service is limited to collect calls, the facility must allow detainees to make direct, free phone calls to . . . legal service providers, in pursuit of legal representation . . . as soon as possible after the request, factoring in the urgency expressed by the detainee.  *Id.* 5.4(II)(E).  Further, after transferring an individual to a new facility, "ICE[] will provide the detainee, in writing, with the name, address, and telephone number of the facility and notify the attorney of record."  *Id.* 7.2(II)(A)(1).

25

Defendants argue that the PBNDS cannot be the basis for an *Accardi* claim, and that plaintiff therefore has failed to state a claim, for two reasons, but neither proffered reason warrants dismissal.  First, defendants deny that the PBNDS is "a legislative rule" to which "the *Accardi* doctrine binds an agency."  Defs.' MTD at 18-19.  Plaintiff, while stating that the PBNDS are "binding," otherwise puts forth little in response.  Pl.'s MTD Opp'n at 14.  The question "'whether agencies are bound by all regulations, or only by legislative regulations,'" is one point of murkiness in a doctrine described as "poorly theorized."  Thomas Merrill, *The* Accardi *Principle*, 74 GEO. WASH. L. REV. 569, 569-70 (2006) (quoting Joshua I. Schwartz, *The Irresistible Force Meets the Immovable Object: Estoppel Remedies for an Agency's Violation of Its Own Regulations or Other Misconduct*, 44 ADMIN. L. REV. 653 (1992)).

In *Accardi*, the Supreme Court noted that the regulation at issue had the "force and effect of law," *Accardi*, 347 U.S. at 265, and later clarified that only rules that "confer important procedural benefits upon individuals," as opposed to those that are "adopted for the orderly transaction of business before" the agency, can be enforced against the agency under the *Accardi* doctrine, *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538-39 (1970).  This focus on protecting procedural rights conferred on individuals by agency rules was reaffirmed in *Morton v. Ruiz*, 415 U.S. 199, 220 (1974), when the Supreme Court concluded that an agency was bound to follow even "its own internal procedures" expressed in an agency manual when "the rights of individuals are affected" by a failure to do so, *id.* at 235.

Synthesizing these developments, the D.C. Circuit has said that "an agency, even one that enjoys broad discretion, must adhere to voluntarily adopted, binding policies that limit its discretion."  *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987).  When the regulations are "procedural rules benefitting the agency," they are not enforceable "absent a showing of substantial

26

prejudice by the complaining party," whereas when the regulations are "procedural rules benefitting the party otherwise left unprotected," they are fully enforceable against the agency under *Accardi*. *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003). "In determining whether an agency's statements constitute 'binding norms,'" and are therefore enforceable as such, "we traditionally look to the present effect of the agency's pronouncements." *Padula*, 822 F.2d at 100. "Statements that are merely prospective, imposing no rights or obligations on the respective parties, will not be treated as binding norms," nor will "[p]ronouncements that impose no significant restraints on the agency's discretion." *Id.*; *see also Nahardani v. Blinken*, No. 22-cv-1926 (CJN), 2022 WL 4474054 (D.D.C. Sept. 26, 2022) (applying *Accardi*, *Padula*, and *Am. Farm Lines* to evaluate whether a regulation "bind[s] the agency" and is a "'procedural rule[] benefiting the agency' or 'procedural rule[] benefitting the party otherwise left unprotected'" (quoting *Damus v. Nielson*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018))). "An agency can be found to have created a 'binding norm' 'if the statement's language, context, and available extrinsic evidence indicate the agency so intended.'" *Bailey v. Fed. Bureau of Prisons,* 780 F. Supp. 3d 96, 131 (D.D.C. 2025) (quoting *Wildearth Guardians v. Salazar*, 783 F. Supp. 2d 61, 72 (D.D.C. 2011)); *see also Seeger v. Dep't of Def.*, 306 F. Supp. 3d 265, 283 (D.D.C. 2018) ("In determining whether administrative policies or internal statements establish judicially manageable standards, courts look to whether statements '[impose] rights or obligations on the respective parties' and whether an agency intended to transform a pronouncement into a binding norm." (alterations in original) (quoting *Padula*, 822 F.2d at 100). In short, "an agency pronouncement is transformed into a binding norm if so intended by the agency." *Padula*, 822 F.2d at 100.

Since an agency may be held to its own "procedures . . . promulgated for the protection of individuals, even where the procedures were not issued as formal regulations," so long as those

procedures are "binding," *Vanover v. Hantman*, 77 F. Supp. 2d 91, 103 (D.D.C. 1999), the key question here is whether the PBNDS, particularly the portions requiring access to phone and in-person visits with counsel and notification of counsel upon transfer, are promulgated for the protection of individuals and are binding on ICE.[11]  At least for the purposes of defendants' motion to dismiss, where the record is sparse as to how the PBNDS are applied or enforced within ICE, plaintiff has stated a claim that these standards were promulgated for the protection of individuals and were binding.  To start, the very purpose of the PBNDS, as expressly stated in the introduction, is to "ensure the due process, health, safety, and security of all individuals in custody." *PBNDS* at 2.  Further, the specific standards that relate to attorney access appear calculated to ensure sufficient access, by specifying, for example, that counsel must be able to visit for "a minimum of" eight hours out of every business day and specifying other rights detainees have to access counsel.  *See PBNDS* 5.5(I), (II)(G)(2).  The standards also appear, without the benefit of any "extrinsic evidence" about how the standards are applied, *see Bailey*, 780 F. Supp. 3d at 131, to be binding, given the repeated use of "shall" and "will" throughout, and their apparent application to all facilities where ICE detainees are held.  Thus, plaintiff has satisfactorily alleged that the PBNDS bind the agency for the benefit of individuals' rights and therefore are enforceable against ICE under the *Accardi* doctrine.

As a second basis for dismissal of plaintiff's claim under the PBNDS, defendants argue that "Plaintiff's claim fails because he does not establish that there was 'any discrete final agency

---

[11]    Defendants also raise the question whether ICE's PBNDS are applicable to the time plaintiff spent in CBP custody.  Defs.' MTD at 19 ("[N]or does [plaintiff] provide any basis for applying the Standards to his custody by CBP.").  Plaintiff alleges, however, that "CBP . . . informed Counsel that the Plaintiff [was] transferred to ICE custody on or about March 31, 2026." Am. Compl. ¶ 27.  At the motion to dismiss stage, where plaintiff's allegations are taken as true, plaintiff is therefore assumed to have been in ICE custody from at least March 31, 2026, until his removal on April 10, 2026, *see* Am. Compl., Ex. B, Email from Defs.' Counsel to Pl.'s Counsel (Apr. 10, 2026, at 4:41 PM) ("[H]e was in ICE custody last . . . ."), precisely the time period during which plaintiff alleges he was deprived of contact with his attorney, Am. Compl. ¶ 29.

decision not to implement' the Standards—just that he believes the Standards were violated in his case." Defs.' MTD at 19 (quoting *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 225 (D.D.C. 2020) (dismissing plaintiffs' *Accardi* claims because "they are not based on final agency action")). To be clear, defendants do not dispute that the PBNDS themselves constitute final agency action or apply to persons in ICE custody, such as plaintiff. Instead, they focus on whether a sufficiently final agency decision was made to deprive plaintiff in this case of the rights guaranteed in the PBNDS. Defs.' MTD at 19.

For an agency action to be "final," the action must "mark[] the consummation of the agency's decisionmaking process" and be "one by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (internal quotation marks omitted). What constitutes a final agency action should be interpreted "pragmatic[ally]," *Ramirez v. ICE*, 338 F. Supp. 3d 1, 40 (D.D.C. 2018), as agency action may be final despite expression in a more "informal" form, *see Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000). "The crux of the inquiry is whether the action is official and presently in effect." *Planned Parenthood of Greater N.Y. v. Dep't of Health & Hum. Servs.*, No. 25-cv-2453 (BAH), 2025 WL 2840318, at *17 (D.D.C. Oct. 7, 2025) (citing *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018)).

Plaintiff has stated a claim, currently unrefuted by defendants, that the denial of counsel to plaintiff was "official and presently in effect" prior to his removal. *See Planned Parenthood of Greater N.Y.*, 2025 WL 2840318, at *17. Plaintiff attests, in a sworn declaration, that he repeatedly asked defendants' staff to speak with counsel, but these requests were "ignored or denied." Pl.'s Aff. at 1. His attorneys have explained that they repeatedly attempted to contact him and ascertain his location, but they too were denied. Am. Compl. ¶¶ 29-31; Chan Decl. ¶ 10. This repeated

denial of counsel affected the "rights" of plaintiff that were supposedly guaranteed by the PBNDS. *Corner Post*, 603 U.S. at 808. Defendants have yet to produce any administrative record or any declarations from those who interacted with plaintiff while he was detained, *see* Defs.' MTD at 1 n.2 (requesting that "the Court excuse [defendants] from having to file the certified list at this time"), including the defendants' representatives who signed the forms in which plaintiff supposedly agreed to voluntary deportation, *see* Pl.'s I-826 Form; Pl.'s I-210 Form, or any official who received his requests for counsel or to revoke his signature across multiple detention facilities and a plane to Honduras. Plaintiff's allegations are sufficient to show that the denial of counsel was final agency action subject to review as to whether the agency complied with its own internal procedures.[12] Even if defendants' contrary view of the facts were relevant at the motion to dismiss stage, which they are not, *see supra* Part II.B, defendants have failed to refute plaintiff's contentions that defendants' officials decided to "ignore[] or den[y]" his requests for counsel. Pl.'s Aff. at 1. Plaintiff's *Accardi* claim thus does not fail for lack of final agency action.

\* \* \*

In sum, in resolving defendants' motion to dismiss, Acting Attorney General Blanche is dismissed as a defendant, plaintiff's APA claim, in Count II, under 5 U.S.C. § 706(1), is dismissed as moot, and the part of his claim, in Count IV, under the *Accardi* doctrine, alleging defendants' failure to comply with 8 C.F.R. § 292.5, is dismissed for failure to state a claim. Plaintiff's claim,

---

[12]     As support, defendants cite to *C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020), and *Americans for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. 22-cv-3118 (CKK), 2023 WL 1438376 (D.D.C. Feb. 1, 2023), in each of which an *Accardi* claim was dismissed based, in part, on a finding of no final agency action. *See* Defs.' MTD at 19. These cases are inapposite, however, because each involved a large group of plaintiffs challenging a general lack of compliance with a wide-ranging set of standards. *See C.G.B.*, 464 F. Supp. 3d at 174 (finding no agency action in *Accardi* challenge when plaintiffs "challenge[d] the 'continuing (and thus constantly changing) operations' of ICE across many detention facilities (quoting *Lujan*, 497 U.S. at 890)); *Ams. for Immigrant Just.*, 2023 WL 1438376, at *3 (finding no agency action in *Accardi* challenge when plaintiffs' claims asked court to "review[] in one fell swoop thousands of individual failures to comply with a particular agency policy in which each individual failure does not itself fix particular legal consequences"). Here, on the other hand, plaintiff challenges specifically the denial of counsel *to him* immediately preceding his removal, and the direct consequences that flowed therefrom.

in Count I, for a writ of mandamus as a potential remedy for the alleged Fifth Amendment violation, as well as his Fifth Amendment claim, in Count III, and *Accardi* claim, in Count IV, based on ICE's PBNDS, survive dismissal, and plaintiff has standing to pursue these remaining claims.

### B.  Plaintiff's Second Motion for TRO

Plaintiff's second motion for a temporary restraining order, which has not been updated or modified since its original filing on April 10, 2026, prior to the filing of the Amended Complaint, requests that defendants be directed to: (1) disclose whether plaintiff was still in U.S. custody at the time of the hearing and which agency last had custody of plaintiff; (2) provide plaintiff access to counsel, if plaintiff was still in U.S. custody; (3) "[n]ot . . . release the Plaintiff to the Honduran government or to his liberty in Honduras; (4) "[p]arole Plaintiff back into the United States under 8 C.F.R. § 212.5(d)(5) to rectify his wrongful removal"; and (5) "facilitate his return to the custody of the United States for him to be paroled back to the United States," if plaintiff is no longer in U.S. custody.  Pl.'s Second TRO Mot. at 3.  The first, second, third, and fourth requested forms of relief are at this point, unambiguously moot, as plaintiff has received this information from the government, and plaintiff is concededly not in any U.S. agency custody.

As a threshold issue, defendants assert that "[b]ecause Plaintiff did not file an amended injunction motion consistent with the scheduling order [along with plaintiff's Amended Complaint], . . . it appears that Plaintiff has abandoned emergency injunctive relief," and further that because plaintiff's second TRO motion "was no longer tethered to the facts or legal theory of the complaint, it was beyond the Court's jurisdiction," and this "mismatch" makes the "entire" TRO motion is moot.  Defs.' MTD at 14.  Despite the force of these arguments, in response, plaintiff confirms that he has not abandoned his second request for emergency injunctive relief,

31

*see* Pl.'s MTD Opp'n at 12 (section titled "Supporting Arguments for the Temporary Restraining Order"), and neither the second TRO motion's reliance on facts outside of the original complaint nor the filing of the Amended Complaint prohibits consideration of the TRO. *See supra* n.5.

Moreover, defendants' argument about the mootness of the second TRO motion is easily dispatched. Although courts have sometimes found impermissible preliminary injunction or TRO motions that have "nothing to do with" the facts in the complaint, *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam), or "present[] issues which are entirely different" from those in the complaint, *Stewart v. INS*, 762 F.2d 193, 199 (2d Cir. 1985), the pending motion for the second TRO stems from the same basic circumstances described by the original complaint—with the development that plaintiff's counsel learned plaintiff was removed from this country just a few hours *after* filing suit and the first TRO motion. The second TRO motion requests different relief than the original TRO motion in response to that new development and, to the extent that the relief sought in plaintiff's second TRO request is mismatched from allegations in the original complaint, that issue is cured by the filing of the Amended Complaint.

The non-moot relief requested by the second motion for a TRO is an order directing defendants to "facilitate [plaintiff's] return to the custody of the United States" and "[p]arole Plaintiff back into the United States under 8 C.F.R. § 212.5(d)(5)." Pl.'s Second TRO Mot. at 3.[13] Plaintiff's showings on each of the four TRO factors to obtain this requested relief are discussed next.

---

[13] "Parole" is temporary permission to physically enter the country, but "shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5). During parole, a person is not in the physical "custody" of the government (*i.e.*, is not detained), though "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id.*

### 1. Likelihood of Success on the Merits

To show a likelihood of success on the merits, plaintiff must show both that he is likely to succeed on a cause of action that survived defendants' motion to dismiss, and that the relief he seeks in his second motion for a TRO is available and within the Court's power to direct. After concluding plaintiff has shown a likelihood of success as to his Fifth Amendment due process claim, the remedies sought in the TRO motion are discussed.[14]

> *(a) Defendants Likely Violated Plaintiff's Due Process Rights, Leading Directly to His Removal*

Plaintiff claims his Fifth Amendment due process rights were violated in two ways, alleging, first, that defendants deprived him of access to counsel while he was in immigration detention for up to ten days immediately preceding his removal, Am. Compl. ¶ 75-76; and, second, that the basis for his removal, namely, his agreement voluntarily to depart, was not in fact "knowing or voluntary" and that he was denied other promised procedural rights prior to being removed, *id.* ¶ 63.

The Due Process Clause "applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent," *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), and that Clause extends to "entitle[] aliens to due process of law in deportation proceedings," *Reno v. Flores*, 507 U.S. 292, 306 (1993). In addition to requiring that noncitizens receive process before they are deported, the right also extends to include a "due process right to obtain counsel of their choice at their own expense," though noncitizens may be required to show prejudice to challenge deprivation or ineffective assistance of counsel. *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990); *see also Huicochea-Gomez v. INS*,

---

[14] Since plaintiff's Fifth Amendment due process claim is sufficient to support the likelihood of success of his second motion for a TRO, the *Accardi* claim based on defendants' violation of the PBNDS—seemingly repeatedly over ten days—need not be addressed.

237 F.3d 696, 699 (6th Cir. 2001) ("Fifth Amendment guarantees of due process extend to aliens in deportation proceedings," including when they can show "that ineffective assistance of counsel prejudiced him or denied him fundamental fairness in order to prove that he has suffered a denial of due process."); *Lozada v. INS*, 857 F.2d 10, 13-14 (1st Cir. 1988) ("Ineffective assistance of counsel in a deportation proceeding is a denial of due process only if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." (internal quotation marks omitted)); *Castaneda-Delgado v. INS*, 525 F.2d 1295 (7th Cir. 1975) ("[T]he right to counsel of their choice in deportation proceedings . . . [is] an integral part of the procedural due process to which the alien is entitled."); *Advocs. for Hum. Rts. v. Dep't of Homeland Sec.*, 820 F. Supp. 3d 789, 803 (D. Minn. 2026) ("Noncitizens' Fifth Amendment right to due process includes both the right to obtain counsel and the right to access counsel.").  The right to due process prior to removal may be waived by, for example, agreeing to voluntary departure, but to be effective that waiver must be "knowing," "considered," and "intelligent."  *United States v. Mendoza-Lopez*, 481 U.S. 828, 840 (1987); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."); *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) ("Our precedents . . . place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent.").

Defendants have made no effort substantively to refute either the legal or factual grounds for plaintiff's Fifth Amendment claim.  *See generally* Defs.' MTD at 19-20.  Defendants do not dispute that plaintiff had a Fifth Amendment due process right to retain and speak with counsel of

34

his choice while detained or to void his signed documents prior to removal. *See generally id.* Nor do defendants either dispute or refute that plaintiff repeatedly "asked to speak with [his] attorney" and was "ignored or denied." Pl.'s Aff. at 1.

In addition to the deprivation of counsel, plaintiff states that "[t]he paperwork [he] signed when [he] was detained was not explained to [him]," and that he "was told the only option [he] had in detention was to sign for the paperwork." *Id.* Defendants attached the signed paperwork to their motion to dismiss, and note that the I-826 form states that "[e]ven if a Plaintiff agrees to voluntarily return [to their country of origin], they can change their mind at any time before they leave the country." Defs.' MTD at 5 (paraphrasing from Spanish language form). Plaintiff avers that he "continued to ask immigration officers to rescind [his] signature on any paperwork [he] may have signed," and told officials after signing that he "was afraid to return to Honduras and . . . wanted an interview or a hearing with the Judge," and that these requests were "ignored or denied each time." Pl.'s Aff. at 1. Other than repeating that plaintiff departed the country "voluntarily," and submitting two declarations from an ICE official, who is silent as to plaintiff's assertions about requesting counsel and to revoke his signature, defendants do not seriously engage to address these allegations about plaintiff's multiple requests to rescind this paperwork. *See, e.g.*, Defs.' MTD Reply at 6 ("Plaintiff accepted voluntary departure and was removed pursuant to his own actions from the United States on April 10."). Defendants do not explain how a waiver of process prior to removal can be voluntary, knowing, and intelligent, if the person waiving his rights (1) is made to believe waiver of such rights is required, (2) does not understand the rights being waived, and (3) is told at the time of waiver that the waiver may be rescinded, but then repeatedly denied the opportunity to execute such rescission. The coercive nature of these circumstances is only compounded by the rushed timing of presenting plaintiff with the forms on the day of or the

35

morning immediately following his arrest and detention, without much, if any, opportunity to consult with counsel. Defendants also assert no other basis for removing plaintiff—that is, defendants do not assert that plaintiff was provided due process prior to removal other than the voluntary deportation agreement that plaintiff signed.

Accordingly, given the unrefuted record before the Court showing that plaintiff was deprived of his due process right to counsel, and that the only process he received prior to deportation was his signing of the I-826 form, for which signature plaintiff credibly contests the voluntariness, plaintiff is likely to succeed on the merits of his claim that he was denied his Fifth Amendment due process rights in the manner of his removal from this country.

*(b) Plaintiff Is Likely Entitled to Have His Return to the United States Facilitated*

When a noncitizen was removed from this country "without any legal process," *Abrego Garcia v. Noem*, No. 8:25-cv-951 (PX), 2025 WL 1024654, at *1 (D. Md. Apr. 4, 2025), a district court may "properly require[] the Government to 'facilitate'" the person's return to the United States, and "to ensure that his case is handled as it would have been had he not been improperly sent to [another country]," *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). Indeed, "[c]ourts, including district courts, regularly find that return is the appropriate remedy when a removal is found to be unlawful." *D.V.D. v. Dep't of Homeland Sec.*, 784 F. Supp. 3d 401, 406 (D. Mass. 2025) (collecting cases); *see also Gordon v. Barr*, 965 F.3d 252, 261 (4th Cir. 2020) (directing government to facilitate return to the United States prior to the Supreme Court's affirmance of such an order in *Abrego-Garcia*); *Nunez-Vasquez v. Barr*, 965 F.3d 272, 286 (4th Cir. 2020) (same); *Ramirez v. Sessions*, 887 F.3d 693, 698 (4th Cir. 2018) (directing the Government "to facilitate [plaintiff's] return to the United States" from El Salvador "to effectuate judicial review" of his removal and "to restore him to the status he had before his removal, such that he

36

may apply for relief under [a statute that could prevent his deportation] under the correct standard"); *Orabi v. Att'y Gen.*, 738 F.3d 535, 543 (3d Cir. 2014) ("direct[ing] [that the government] . . . return Orabi to the United States" when he had been deported based on criminal convictions that "were not final for immigration removal" yet); *Zapata v. Mullin*, No. 26-cv-1560 (RJL), 2026 WL 1352420, at \*1-2 (D.D.C. May 13, 2026) (ordering that "defendants shall take all available steps to facilitate the return of plaintiff to the United States as soon as possible" after concluding that "the Government is [not] likely to succeed on any of its jurisdictional arguments); *Cruz v. Oddo*, No. 3:26-cv-284 (SLH), 2026 WL 1650733, \*5 (W.D. Pa. June 8, 2026) ("The Court can still grant meaningful relief [after noncitizen was deported] by ordering Respondents to facilitate Petitioner's return and to restore, as nearly as practicable, the posture Petitioner would have occupied had Respondents not transported him out of the United States . . . ."); *J.O.P. v. Dep't of Homeland Sec.*, 779 F. Supp. 3d 570, 583 (D. Md. 2025) ("[T]his Court will order Defendants to facilitate [a non-citizen's] return to the United States so that he can receive the process he was entitled to . . . .").

In some cases, courts have declined to order the U.S. government to facilitate noncitizens' return when doing so would involve "order[ing] the U.S. government to order a foreign government to take any action." *D.A. v. Noem*, 800 F. Supp. 3d 43, 53 (D.D.C. 2025). On a similar note, when fashioning orders directing the return of removed noncitizens, the Supreme Court has cautioned that district courts must act "with due regard for the deference owed to the Executive Branch in the conduct of foreign affairs," specifically admonishing that an order using the term to "effectuate" an individual's return "may exceed the District Court's authority." *Abrego Garcia*, 145 S. Ct. at 1018. In both *D.A.* and *Abrego Garcia*, the plaintiff was detained in the custody of another country, whereas here, plaintiff seems to be at his liberty in Honduras. *See supra* n.4. If

37

any logistical or political sensitivities are implicated by returning plaintiff to this country, defendants raise none, and in any case the Supreme Court has affirmed the appropriateness of ordering the government to "facilitate" a noncitizen's return for further adjudication, even if the government may not be directed to "effectuate" the return. *Abrego Garcia*, 145 S. Ct. at 1018. Plaintiff here requests only an order directing defendants to "facilitate" his return. *See* Pl.'s Second TRO Mot. at 3.

Defendants attempt to distinguish *Abrego-Garcia* based on the government's concession in that case about the removal resulting from an administrative error. *See* Def.' MTD at 26-27. This distinction is unavailing. The Supreme Court stated that return was the proper remedy when a noncitizen was, more broadly, "improperly sent to" another country, *Abrego Garcia*, 145 S. Ct. at 1018, with the mechanism producing that improper removal not limited to a government concession of error. While a government concession of removal error may certainly make the outcome easier to reach, the lack of such a concession does not alter the legal standard governing issuance of emergency injunctive relief, which requires only that plaintiff show a likelihood of success on the merits, *not* a concession from the government on the merits. Given that plaintiff has shown a likelihood that he will succeed in his claim that his removal resulted from multiple deprivations of due process, *see supra* Part III.B.1(a), facilitating his return is an appropriate remedy for plaintiff's "improper[]" removal, *Abrego Garcia*, 145 S. Ct. at 1018; *see also Zapata*, 2026 WL 1352420, at \*2 (ordering return without concession from government that removal was wrongful); *D.V.D.*, 784 F. Supp. 3d at 406 (same); *Cruz*, 2026 WL 1650733, \*5 (same).

Whether an order directing facilitation of plaintiff's return to the United States is appropriate "hinges on whether [he] is likely to succeed in arguing that [his] removal [was] unlawful under the circumstances." *Roberts v. Anda-Ybarra*, No. 26-cv-377 (DCG), 2026 WL

38

1459725, *8 (W.D. Tex. May 22, 2026).  As explained, plaintiff has shown a likelihood of success on his claim that his removal to Honduras was caused by two violations of due process: (1) deprivation of counsel in the 10 days immediately prior to his removal, and (2) denial of any due process prior to removal other than his signing a voluntary removal agreement, which plaintiff vigorously and persuasively raises doubt was both knowing and voluntary.  Thus, "return is the appropriate remedy when a removal is found to be unlawful."  *D.V.D.*, 784 F. Supp. 3d at 406.[15]

Additionally, to prevent repetition of the issues sought to be addressed by plaintiff's original TRO motion in this case and to ensure that this matter may be resolved with appropriate participation from plaintiff, defendants are directed to ensure access to counsel and notification of counsel when plaintiff is moved, which directions are also consistent with compliance with the PBNDS.[16]  Furthermore, "'[f]acilitate' is an active verb," *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112, at *1 (4th Cir. Apr. 17, 2025), and in this situation, where plaintiff is at his liberty in Honduras, this order includes paying for and facilitating access to transportation back to the United States, *see* Am. Compl. at 18 (Prayer for Relief) (requesting payment for transportation back to the United States), and, upon return, "ensur[ing] that his case is handled as it would have been had he not been improperly sent to" Honduras, *Abrego Garcia*, 145 S. Ct. at 1018.

---

[15]   At the TRO hearing, defendants raised the argument that an order for defendants to facilitate plaintiff's return to this country would be "a mandatory injunction that represents a significant change in circumstances."  H'rg Tr. at 12:12-13.  A TRO may be used, however, to restore the status quo prior to the *wrongdoing*, not only to maintain the status quo at the time the Order is issued.  *See, e.g.*, *Dellinger*, 2025 WL 559669, at *7 (upholding TRO that directed that an officer removed from his position be permitted to perform his duties during the TRO, since that was the status quo before the officer was allegedly illegally removed); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) ("'The status quo is the last *uncontested* status which preceded the pending controversy,'" not the immediately "pre-litigation status quo." (emphasis in original) (quoting *District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969))); *see also Abrego Garcia*, 145 S. Ct. at 1018 (upholding preliminary injunction ordering return of plaintiff to the United States after unlawful removal without evaluating whether mandamus would have been available).

[16]   Since plaintiff has neither moved for a preliminary injunction nor asked for the TRO to be converted into a preliminary injunction, this order will last only fourteen days from the date of issuance.  *See* FED. R. CIV. P. 65(b)(2).

*(c) Plaintiff Has Not Shown Likely Entitlement to Parole*

In addition to seeking that the United States facilitate his return to the United States, plaintiff seeks an order directing the government to "[p]arole Plaintiff back into the United States under 8 C.F.R. § 212.5[(b)](5)." Pl.'s Second TRO Mot. at 3.[17] In other words, plaintiff seeks not only to be returned to the United States, but also to be paroled, or released from detention, upon his return. For at least two independent reasons, plaintiff has not shown that he is entitled to an order directing this further action by defendants.

First, 8 C.F.R. § 212.5(b)(5), and the regulation's governing statute, 8 U.S.C. § 1182(d)(5)(A), give discretion to the Secretary of Homeland Security, or the Secretary's delegees, at every turn about whether to parole an individual. The statute provides that "[t]he Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, . . . and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5)(A). In turn, 8 C.F.R. § 212.5 provides that this discretionary authority of the Secretary of Homeland Security "shall be exercised" by certain officials, such as the Director of Detention and Removal, field office directors, and other specified immigration officials. 8 C.F.R. § 212.5(a). The regulation goes on to state that "[t]he parole of aliens within the following groups who have been or are detained . . . would generally be justified only on a case-by-case basis

---

[17]    Plaintiff's second TRO motion refers to 8 C.F.R. § 212.5(d)(5) as a basis for granting parole, but this appears to be an erroneous citation, since § 212.5 does not have a subparagraph (d)(5) and subsection (d), generally, enumerates conditions that may be placed on parolees. Instead, 8 C.F.R. § 212.5(b) discusses parole for "urgent humanitarian reasons" or "significant public benefit," which plaintiff discusses as bases for paroling him, *see* Pl.'s MTD Opp'n at 11.

for 'urgent humanitarian reasons' or 'significant public benefit,' provided the aliens present neither a security risk nor a risk of absconding," and lists several groups of individuals including, as relevant here, "[a]liens whose continued detention is not in the public interest as determined by those officials identified in paragraph (a) of this section." *Id.* § 212.5(b)(5). Every component of this statute and regulation emphasizes that parole is never required, is entirely subject to the DHS officials' discretion, and may be granted only on "case-by-case" judgment of the Secretary or the delegees. Plaintiff points to no case law or other authority indicating that courts may order these officials to exercise their discretion under these provisions, and the Court declines to do so here.

Second, importantly, plaintiff has not shown that his *detention* resulted from deprivations of his rights and that paroling him is therefore necessary to return the status quo. The deprivations plaintiff alleged in his complaint and briefing occurred after he was detained on March 18, 2026, at which point he was deprived of contact with his attorney beginning in late March 2026, and "voluntarily" removed based on a waiver that he alleges was not knowing and voluntarily and that he repeatedly attempted to revoke. *See* Pl.'s Aff. at 1; Am. Compl. ¶¶ 71-80. To be sure, at certain points in his briefing, plaintiff alludes in passing to his improper detention, *see, e.g.*, Pl.'s MTD Opp'n at 8 ("[Plaintiff] challenges [the government's] authority—not its discretion—to detain and remove an SIJ beneficiary with active Deferred Action . . . ."), but plaintiff dropped his habeas claim from his original complaint and now asserts, as the only basis for ordering his parole, *i.e.*, release from detention, the entirely discretionary provisions of 8 C.F.R. § 212.5, without explaining why his detention was wrongful or violated his rights in the first place. Plaintiff has not shown entitlement to requested relief to the extent of parole into the United States.

### 2. Irreparable Harm

Plaintiff has demonstrated irreparable harm should he be forced to remain in Honduras. He alleges that he is "afraid to be here in Honduras," because he "suffered a lot of physical abuse by [his] father when [he] was a child" and "still ha[s] scars on his body from what [his] father did to him." Pl.'s Aff. at 2. Plaintiff avers he is in the same city where he originally fled from this abuse. Pl.'s MTD Opp'n at 13; *see also A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 221 (D.D.C. 2020) (finding that "significant risk of physical harm" constitutes irreparable injury). Indeed, "Congress established SIJ status in 1990 in order to protect abused, neglected, or abandoned children who . . . illegally entered the United States," *Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 163 (3d Cir. 2018) (internal quotation marks omitted), and plaintiff is now at risk of being subject to the harm that Congress intended to prevent. Even if plaintiff were not exposed to his abusive father while in Honduras, plaintiff also asserts "daily, agonizing separation from his minor 3-year-old U.S. citizen child and extended family" as an irreparable harm. Pl.'s MTD Opp'n at 14; *see also M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 121-22 (D.D.C. 2018) (holding that "there can be no dispute" that "excruciating" "separation from [plaintiff's] son" constitutes "irreparable harm"). Thus, plaintiff has shown that he will suffer irreparable harm if forced to remain even longer in Honduras due to the risk of physical harm he suffers there and the separation from his minor child.

### 3. Balance of the Equities and the Public Interest

The remaining factors, the balance of the equities and the public interest, merge where, as here, the government is the opposing party. *Pursuing Am.'s Greatness*, 831 F.3d at 511. This factor likewise favors plaintiff.

As described, plaintiff's interests are significant here. In addition to the irreparable harm he is likely to suffer if he remains in Honduras, plaintiff also cannot begin to undergo appropriate

process for his removal, adjustment of status, or other immigration outcome until he returns here. Though the public has an interest in conserving government resources by allowing removals to be final, that interest is not well served by allowing the government to make removals without due process, which then necessitate actions such as facilitating a person's return to this country. Notably, defendants make no arguments about the equities or the public interest. *See generally* Defs.' MTD; Defs.' MTD Reply. The balance of the equities accordingly cuts in favor of plaintiff.

\* \* \*

Since each of the four factors favors plaintiff as to the relief sought that defendants facilitate his return to the United States, a temporary restraining order directing defendants to facilitate that return will issue.

On a final note, the relief issued is narrow, with no decision made as to whether defendants might have some legitimate basis for removal of plaintiff other than his "voluntary" waiver of removal proceedings, or whether plaintiff might have a basis on which to seek release from the custody of immigration authorities, if detained upon his return to the United States.[18] At the same time, because defendants likely deprived plaintiff of counsel and other procedural rights prior to his purportedly "voluntary" waiver of removal proceedings, rendering his waiver of removal proceedings likely improper, and because his removal flowed directly from these violations of plaintiff's Fifth Amendment due process rights, defendants are directed to facilitate his return to the United States "to ensure that his case is handled as it would have been had he not been improperly sent to" Honduras. *Abrego Garcia*, 145 S. Ct. at 1018. "For its part, the Government

---

[18] Additional issues raised by the parties but not necessary to resolve here are whether 8 U.S.C. § 1252(g) would bar the Court from directing defendants to commence removal proceedings against plaintiff, *see* Defs.' MTD at 28-28; Defs.' MTD Reply at 13-16; whether plaintiff was deportable under 8 U.S.C. § 1227, *see* Pl.'s MTD Opp'n at 8-9; whether plaintiff's allegations that he fears returning to Honduras are relevant to his ultimate removability, Defs.' MTD Reply at 23; whether SIJ status affects plaintiff's removability, Defs.' MTD Reply at 15-16; or whether defendants' initial detention of plaintiff was lawful or proper.

should be prepared to share what it can concerning the steps it has taken [to facilitate plaintiff's return] and the prospect of further steps." *Id.*

## IV.    CONCLUSION

The foregoing reasons, defendant's Motion to Dismiss, ECF Nos. 21, 23, is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, defendant's Motion to Dismiss is **GRANTED** to dismiss Acting Attorney General Todd Blanche as a named defendant, Count II (APA claim under 5 U.S.C. § 706(1)) and Count III (*Accardi* doctrine) of the Amended Complaint, insofar as the latter claim relies on 8 C.F.R. § 292.5, and otherwise **DENIED**.

Plaintiff's Second Motion for a Temporary Restraining Order, ECF No. 8, is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, this motion is **DENIED AS MOOT** to the extent that plaintiff seeks an order directing defendants to provide certain information, to provide plaintiff with access to counsel, and not to relinquish custody of plaintiff in Honduras, and further **DENIED** to the extent plaintiff seeks an order directing defendants to parole plaintiff into the United States, and **GRANTED** to order defendants to facilitate plaintiff's return to the United States for proper processing of his immigration case.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  June 23, 2026

_____
**BERYL A. HOWELL**
United States District Judge