**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOSE ELIEZER MARTINEZ-ANDINO,

Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

Defendants.

Civil Action No. 26-1208 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

Plaintiff, Jose Martinez-Andino, a 21-year-old citizen of Honduras, who is authorized to work in the United States, due to his approved Special Immigrant Juvenile ("SIJ") status, and is employed as a mechanic to support his minor U.S. citizen child, was subject to a civil immigration arrest and detention on March 18, 2026.  Am. Compl. ¶¶ 2, 19, 24, ECF No. 19; Pl.'s Aff. (Apr. 13, 2026) at 1, ECF No. 13-1; Pl.'s Mot. for Preliminary Injunction ("Pl.'s Mot."), ECF No. 37, Attach., Letter from Pl. (July 10, 2026) (trans.) at 1, ECF No. 37-2.  He attests that, less than 48 hours later, while detained, he was coerced to sign two forms agreeing to voluntary departure, without knowingly and voluntarily agreeing to the terms, that he repeatedly requested to revoke his agreement as permitted by federal law, including after speaking with his counsel, but was ignored, and that he was then deprived of access to his retained counsel for ten days, hindering his ability to enforce his procedural rights prior to his deportation.  Pl.'s Aff. (Apr. 13, 2026) at 1. Nonetheless, he was flown to Honduras by the U.S. government on April 10, 2026, barely three weeks after his civil arrest, based solely on his having signed the forms.  Am. Compl. ¶¶ 39-41; Defs.' Mot. to Dismiss ("Defs.' MTD") at 5-6, ECF No. 21.  Plaintiff claims that these circumstances, created by the actions of government defendants—the Department of Homeland

1

Security ("DHS") and its department head, and the heads of Immigration and Customs Enforcement ("ICE"), ICE's Enforcement and Removal Operations, Customs and Border Protection ("CBP"), and CBP's Border Patrol Division—violated his Fifth Amendment right to due process and procedural rights guaranteed to him by law and defendants' own policies, and directly resulted in him being flown, without his consent, to Honduras. *See* Pl.'s Mot at 1-2.[1]

After obtaining a temporary restraining order ("TRO") directing defendants to facilitate plaintiff's return to this country so that he may be afforded the process due to him prior to deportation, that TRO lapsed without plaintiff moving for a preliminary injunction. *See* Temporary Restraining Order ("TRO"), ECF No. 26; *Martinez-Andino v. Dep't of Homeland Sec.*, No. 26-cv-1208 (BAH), 2026 WL 1801137 (D.D.C. June 23, 2026), docketed at ECF No. 27; Minute Order (July 8, 2026) (declining to extend TRO for a second time given the three-month lapse since plaintiff filed TRO motions and his failure to move for a preliminary injunction in that time). Plaintiff now seeks a preliminary injunction ordering defendants to continue steps to facilitate his return to this country.  Pl.'s Mot.

For the reasons explained below, plaintiff's motion is **GRANTED**, and defendants are **DIRECTED** to continue, in a prompt and expeditious manner, efforts to facilitate his return to this country.

## I.    BACKGROUND

The factual background, already detailed in deciding plaintiff's motion for a temporary restraining order, and as supplemented with an additional statement from plaintiff, is set out below,

---

[1]    Plaintiff names the following defendants: the Department of Homeland Security ("DHS"), the DHS Secretary, in his official capacity, and the Acting Director of ICE, the Acting Executive Associate Director of ICE's Enforcement and Removal Operations, the Commissioner of CBP, and the Chief of CBP's Border Patrol, also in their official capacities. *See* Am. Compl. at 1.  The Acting Attorney General was dismissed as a defendant upon defendants' motion. *See Martinez-Andino v. Dep't of Homeland Sec.*, No. 26-cv-1208 (BAH), 2026 WL 1801137, at *8 (D.D.C. June 23, 2026), docketed at ECF No. 27.

followed by the procedural history of the case.

### A. Factual Background

Martinez-Andino is a Honduran citizen who entered the United States on or around September 12, 2020, when he was fourteen years old, by crossing the United States/Mexico border in Texas. Am. Compl. ¶ 19. Deemed "to be an unaccompanied minor child," he was "placed in immigration removal proceedings" immediately thereafter. *Id.* ¶¶ 19-20; Compl., ECF No. 1, Ex. D, Notice to Appear (Sept. 11, 2020), ECF No. 1-2 at 11. In July 2023, an immigration court "granted dismissal of removal proceedings upon joint motion by [plaintiff] and the U.S. Department of Homeland Security," noting that plaintiff had "an approved I-360 Application for Special Immigrant Juvenile Status and intends to file . . . [an application] to become a lawful permanent resident." Am. Compl. ¶ 21. "Special Immigrant Juvenile" is a statutorily defined category encompassing certain individuals under 21 years old who are present in the United States and whom a state court has found cannot be returned to their parents or home country due to abuse, neglect, or abandonment. 8 U.S.C. § 1101(a)(27)(J); *see also* U.S. Citizenship and Immigration Servs. ("USCIS"), *Special Immigrant Juveniles*, https://www.uscis.gov/working-in-US/eb4/SIJ [https://perma.cc/P5EM-FBD5]. Individuals with SIJ status may apply for lawful permanent residency, 8 U.S.C. § 1255(h), though this process may take several years, since applications for lawful permanent residency are reviewed on a rolling basis based on the date when the SIJ status was approved, Am. Compl. ¶ 21 & n.1. Since 2022, the government has offered deferred action (*i.e.*, withholding of removal) to individuals with SIJ status, along with employment authorization. *See* USCIS, *Special Immigrant Juveniles*.[2]

---

[2]    On June 6, 2025, USCIS rescinded the deferred action policy for those with SIJ status, though the change left in place deferred action for those individuals, *like plaintiff*, already holding that status. *See* USCIS, *Special Immigrant Juveniles*.

3

Under the work authorization he enjoyed due to his SIJ status, plaintiff lives in North Carolina and works as a mechanic in the United States.  Letter from Pl. (July 10, 2026); Pl.'s Reply, Att., Form I-213, provided on July 16, 2026, in Resp. to Pl.'s Record Request, under Freedom of Information Act ("Form I-213"), ECF No. 39-1.  His life in the United States was upended in March 2026, when plaintiff was driving through Montana.  *See* Form I-213 at 3 (showing plaintiff was stopped by Montana Highway Patrol on March 18, 2026, and then transferred to custody of CBP agent the same or next day); *cf.* Compl., Ex. A, Decl. of Alison T. Chan, Pl.'s Counsel ("Chan Decl.") ¶ 2, ECF No. 1-2 at 1 (stating plaintiff was arrested "while driving through the state of Minnesota").

On March 18, 2026, plaintiff was arrested by immigration officials "and detained at the Cascade County Jail in Montana."  Am. Compl. ¶ 24.  That same day, plaintiff's relatives contacted his current counsel, but when counsel promptly checked the online ICE Detainee Locator, no information about plaintiff was provided.  Chan Decl. ¶ 2.  Five days later, on March 23, 2026, while still in a county jail, plaintiff called attorney Alison Chan.  *Id.* ¶ 3; Am. Compl. ¶ 25.  In that call, plaintiff communicated that he had "sign[ed] documents he did not fully understand," which he characterized as "removal paperwork," although he was "unable to articulate to [Chan] what documents he signed."  Am. Compl. ¶ 25.

On March 31, plaintiff's counsel was retained by plaintiff's family and entered a notice of appearance with ICE, since "CBP . . . informed Counsel that the Plaintiff [was] transferred to ICE custody on or about March 31, 2026."  *Id.* ¶¶ 27-28; *cf.* Chan Decl. ¶ 9 ("On March 31, 2026, Cascade County Jail confirmed to me by phone that Mr. Martinez Andino was transferred to ICE custody on March 28, 2026.").  Between March 31 and April 10, however, plaintiff's counsel was never able to speak to plaintiff.  Am. Compl. ¶ 31.  Indeed, despite contacting both ICE and CBP multiple times to obtain information as to plaintiff's location and which agency had custody of

plaintiff, this critical information was not forthcoming. *Id.* ¶ 29; Chan Decl. ¶ 10. In response to plaintiff's counsel's repeated queries, both ICE and CBP denied having custody of plaintiff. Am. Compl. ¶ 30. CBP asserted that ICE had taken custody of him on March 30 or 31, whereas ICE denied having ever taken custody of him. *Id.* During this ten-day period, neither ICE nor CBP would confirm plaintiff's physical whereabouts or put counsel in touch with him directly. *Id.* ¶ 36. Not even plaintiff's family heard from plaintiff after "the weekend of March 28." *Id.* ¶ 37.

## B. Procedural History

Two TRO motions brought by plaintiff and one motion to dismiss filed by defendants have already been resolved in the three-and-a-half months since this case was filed.

### 1. First TRO Motion and Hearing

On Friday, April 10, 2026, after at least 10 days of not hearing from plaintiff and being denied information by defendants as to plaintiff's whereabouts or custodial status, plaintiff's counsel initiated this action, filing the complaint and an accompanying motion for temporary restraining order at approximately 11:30 AM on Friday, April 10, 2026. *See* Compl.; Pl.'s First Mot. for TRO, ECF No. 2. As relief, plaintiff sought an order directing defendants to (1) disclose plaintiff's "current physical location"; (2) "identify the agency currently exercising custody" over plaintiff; and (3) "provide Plaintiff with immediate access to counsel." Pl.'s First TRO Proposed Order at 1-2, ECF No. 2-1. The original complaint also contained a petition for a writ of habeas corpus. Compl. ¶¶ 53-55.

The case was randomly assigned to the undersigned an hour later that same day, and a teleconference TRO hearing was scheduled for 4:00 PM that afternoon. *See* Minute Order (Apr. 10, 2026, at 3:13 PM). Due to technical difficulties on defendants' counsel's part, the hearing began at 4:07 PM. *See* Hr'g Tr. at 1. At the outset, defendants' counsel stated that plaintiff "flew to Honduras this morning, and the flight that he was on . . . landed in Honduras at 10:50 Honduras

time [12:50 EST]," and that plaintiff was "no longer . . . in the custody of any government agency." *Id.* at 5:1-5.  Plaintiff's counsel indicated that, prior to that afternoon, they "had no idea that he was going to be deported" and expressed that they "don't believe that he could have knowingly and voluntarily signed something if he was being deprived of advice of counsel for over a week." *Id.* at 10:9, 11:23-25.

Plaintiff's motion for TRO was granted to the extent that motion sought information about plaintiff's custody and location, since this information had been provided at the hearing, and directed that, if still in government custody, plaintiff be provided with access to counsel.  Hr'g Tr. at 12:19-24, 14:18-22; Minute Order (Apr. 10, 2026, at 5:04 PM).  This motion was denied "insofar as plaintiff is no longer in the custody of any agency of the U.S. Government," since the request that he be allowed to contact counsel was predicated on his continued detention in U.S. custody. Minute Order (Apr. 10, 2026, at 5:04 PM); *see also* Hr'g Tr. at 13:2-7.

### 2.  Second TRO Motion and Defendants' Motion to Dismiss

At approximately 6:00 PM the same Friday, April 10, 2026, plaintiff filed a second motion for a TRO, this time seeking an order directing defendants to (1) disclose whether plaintiff was still in U.S. custody at the time of the hearing and which agency last had custody or plaintiff; (2) provide plaintiff access to counsel, if plaintiff was still in U.S. custody; (3) "[n]ot . . . release the Plaintiff to the Honduran government or to his liberty in Honduras; (4) "[p]arole Plaintiff back into the United States under 8 C.F.R. § 212.5(d)(5) to rectify his wrongful removal"; and (5) "facilitate his return to the custody of the United States for him to be paroled back to the United States," if plaintiff was no longer in U.S. custody.  Pl.'s Second Emergency Mot. for TRO at 3, ECF No. 8. Defendants were directed to file, by Monday, April 13, 2026, at 2:00 PM, responses to the factual disclosures sought by plaintiff, with plaintiff's response due the following day.  Minute Order (Apr. 10, 2026, at 6:42 PM).

Defendants' response was timely filed on April 13, 2026, accompanied by a declaration from Christopher George, the Deputy Assistant Director of the International Operations Division within ICE's Removal Division of Enforcement and Removal Operations. *See* Defs.' Resp. to Order of the Ct., ECF No. 10; Decl. of ICE Deputy Ass't Dir. Christopher George ("First ICE Decl."), ECF No. 12. This ICE declaration stated that "at approximately 8:00 AM EST, Martinez-Andino departed the United States via Mesa, Arizona, on a chartered removal flight to Honduras," at which time he was in ICE custody. First ICE Decl. ¶ 5. According to ICE, plaintiff landed at "approximately 12:50 PM EST," and "no later than 2:00 PM EST . . . was transferred from ICE custody to the custody of the Government of Honduras[]," *id.* ¶ 6, purportedly clarifying that plaintiff was no longer in U.S. government custody at the time of the TRO hearing on April 10, 2026.

Later that same day, plaintiff, whom counsel had been able to contact in Honduras, filed an affidavit, stating that "[t]he paperwork [he] signed when [he] was detained was not explained to [him]," and he was "told the only option [he] had in detention was to sign for the paperwork." Pl.'s Aff. (Apr. 13, 2026) at 1. After signing the paperwork, he "asked . . . to rescind [his] signature" and "told immigration officials that [he] was afraid to return to Honduras and . . . wanted an interview or a hearing with the Judge," which requests were "ignored or denied." *Id.* Moreover, he "asked to speak with [his] attorneys for 9 days between March 31 and April 9," which "requests were ignored or denied." *Id.* During his U.S. detention, he "felt terribly mistreated," due to poor food and no access to showers. *Id.*

Plaintiff also recounted a timeline on the day of deportation quite different from that offered by defendants, either through defendants' counsel at the TRO hearing held the afternoon of Friday, April 10, or in the ICE Declaration filed on Monday, April 13. According to plaintiff, he landed in Honduras "around 2:00 p.m. (Honduras time)" (4:00 PM EST) on April 10, after which he "spent

7

about 2 hours on the plane." *Id.* "It was about 4:00 p.m. (Honduras time) [6:00 PM EST] when [they] first started to go through immigration in Honduras," and plaintiff "remember[s] the time because [they] asked what time it was when [they] landed, and then [they] asked what time it was when [they] got off the plane." *Id.* Plaintiff believes "it took about 1.5 hours to go be processed by Honduran officials," placing the time of processing at around 7:30 PM EST. *Id.* Plaintiff stated he was "afraid to be . . . in Honduras" because he "suffered a lot of physical abuse by [his] father when [he] was a child" and "still ha[s] scars on [his] body from what [his] father did to [him]." *Id.* at 2.

Given the apparent factual conflicts and concomitant legal issues as to the legal viability of plaintiff's claims and relief sought, the parties were directed to propose a briefing schedule, Minute Order (Apr. 14, 2026), which proposal was adopted, Minute Order (Apr. 15, 2026); *see also* Jt. Status Report, ECF No. 16 (proposing schedule for plaintiff's filing of any amended complaint or amended TRO or preliminary injunction motion, for defendants' filing of a motion to dismiss, and for briefing to be completed by June 17, 2026, on both motions).

Plaintiff subsequently filed the operative Amended Complaint, *see* Am. Compl., without any amended motion for a new TRO or preliminary injunction motion. The Amended Complaint drops the habeas claim set out in the original complaint, since plaintiff is no longer in U.S. government custody, and asserts five claims for relief: (1) pursuant to the Mandamus Act, 28 U.S.C. § 1361, due to defendant's breach of "duty to maintain accurate custody information and permit attorney access," *id.* ¶¶ 64-69 (Count I, Mandamus); (2) for violation of the Administrative Procedure Act, 5 U.S.C. § 706(1), since defendants "unlawfully withheld agency action by failing to disclose Plaintiff's location and permit access to counsel while he was under the custody of the agency," *id.* ¶¶ 70-72 (Count II, APA); (3) for violation of the Fifth Amendment, due to defendants' interference with plaintiff's "access to counsel," *id.* ¶¶ 73-76 (Count III, Fifth Amendment); (4)

8

for violation of the *Accardi* doctrine, which requires agencies to comply with their own regulations, *id.* ¶¶ 77-81 (Count IV, *Accardi* doctrine); and (5) pursuant to the All Writs Act, 28 U.S.C. § 1651, in the form of "[a]n order compelling the facilitation of Plaintiff's return . . . to restore the Court's jurisdiction," *id.* ¶¶ 82-87 (Count V, All Writs Act).  As relief, plaintiff seeks (1) a declaratory judgment that defendants' denial of plaintiff's access to counsel, obtaining plaintiff's agreement to removal "through coercive tactics," and removing plaintiff from the United States "violated the Fifth Amendment, the APA, and the *Accardi* doctrine," (2) a writ of mandamus directing defendants to "facilitate" plaintiff's return to the United States, "issu[e] humanitarian parole travel documents under 8 C.F.R. § 212.5 to allow for admission into the United States," and "provid[e] for the cost of Plaintiff's return flight to the United States," (3) vacatur of plaintiff's removal and restoration of his deferred action status; (4) a permanent injunction prohibiting interference by defendants with plaintiff's right to counsel or right to seek adjustment of status; and (5) attorneys' fees. *Id.* at 18-19 (Prayer for Relief).

Defendants moved to dismiss the Amended Complaint for lack of subject-matter jurisdiction and failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6).  *See* Defs.' MTD.  Submitted with that motion is a second declaration by the same ICE official correcting his prior declaration.  Second Decl. of Christopher George ("Second ICE Decl.") ¶¶ 5-7, ECF No. 23-3.  Specifically, the Second ICE declaration states that the declarant "discovered that the times as reported in the records [he] used to prepare for [his first] declaration were reported in local time in Honduras, not Eastern Standard Time as [he] originally believed," and, with the correct time zones, that plaintiff "departed the United States" "in ICE custody" on April 10, 2026, at "approximately 10:00 AM EST," landed in Honduras at "approximately 2:50 PM EST," and "all aliens on the removal flight were confirmed as handed over to the custody of the Government of Honduras[] . . . by 4:10 PM EST"—which is ten minutes into the scheduled

9

hearing time on April 10 and approximately three minutes after the April 10 hearing actually began.[3]

Also attached to defendants' motion to dismiss are two forms, DHS Form I-826 and Form I-210, which reflect plaintiff's signature on the day of and the morning after his initial arrest and detention in a Montana jail, and on which defendants base their assertion that plaintiff was voluntarily deported. The single-page DHS Form I-826, titled "Notice of Rights and Request for Disposition," is in Spanish and shows plaintiff's signature next to the typewritten date "03/18/2026"—the same date as his arrest and detention—with the redacted name of an "Immigration Officer," next to a different typed date "March 19, 2026 10:08 AM." Defs.' MTD, Ex. A, Form I-826, ECF No. 21-1. The text on this DHS Form I-826 states, *inter alia*, that the signor has "the right to contact an immigration attorney or other legal representative," and outlines three options for disposition of an immigration case: (1) "I request a hearing before the Immigration Court to determine whether or not I may remain in the United States"; (2) "I believe I face harm if I return to my country. My case will be referred to the Immigration Court for a hearing"; and (3) "I admit that I am in the United States illegally, and I believe I do not face harm if I return to my country. I give up my right to a hearing before the Immigration Court. I wish to return to my country as soon as arrangements can be made to effect my departure. I understand that I may be held in detention until my departure." *Id.* Notably, the form states, "If you choose to return to your country, you may change your mind and request a hearing before an immigration judge at any time before your departure from the United States. You must immediately notify an immigration officer if you change your mind." *Id.* The copy of the form provided by defendants

---

[3]    Obviously, the parties' timeline for the day of plaintiff's deportation still conflicts, but resolving the precise time plaintiff was transferred out of U.S. custody is not necessary to resolve the pending motion for preliminary injunctive relief.

shows plaintiff's initials next to the third option ("I wish to return to my country . . ."), and his signature, with the typewritten date, "03/18/2026."  The bottom of the form has checked boxes indicating the Notice was "read by subject" and "read to subject by [redacted name] in the Spanish language," followed by the redacted name in a digital signature of an "Immigration Officer" affixed at "2026.03.19 10:10:41" with the letters "CBP," and the typewritten date "March 19, 2026 10:08 AM."  *Id.*

The second form submitted by defendants, a four-page DHS Form I-210, confirms receipt by DHS of plaintiff's agreement to removal (*i.e.*, the Form I-826), and affirms that DHS has "granted voluntary departure," requiring plaintiff to depart "on or before [March 23, 2026]."  Defs.' MTD, Ex. B, Form I-210, ECF No. 21-2.  Plaintiff's handwritten signature appears next to the handwritten date, "3/19/2026," and the redacted name of an "Authorized DHS Official" digitally signed on "2026.03.19 10:36:37"—indicating this form was signed the morning immediately after plaintiff's arrest and detention.  *Id.*  The addendum to this form also bears plaintiff's handwritten signature, next to the handwritten date, "3/19/2026," under the text, stating, in part, "I hereby knowingly, voluntarily, and intelligently waive my opportunity to file any and all applications for relief or protection from removal, deportation, or exclusion under the immigration laws.  I acknowledge that I do not have a fear of return to my country."  *Id.*  The Form I-210 and addendum are both in English, with the addendum stating that "[t]he alien was provided an oral interpretation/written translation of this Declaration in the alien's preferred language," above the digital signature of a redacted name, digitally signed "2026.03.19 10:40:28," by a "Supervisory Border Patrol Agent."  *Id.*

In sum, these two forms indicate that between about 10:08 AM and 10:40 AM on March 19, 2026, the morning after plaintiff was picked up and detained in a local county jail, and before finding, consulting with, and retaining counsel, plaintiff had executed DHS forms volunteering to

leave the United States. Further, the forms make explicit that plaintiff could change his mind at any point prior to departure by notifying an immigration officer that he no longer wished to voluntarily depart.

Briefing on plaintiff's second TRO motion and defendants' motion to dismiss became ripe for resolution on June 17, 2026, in accordance with the schedule proposed by parties and adopted by the Court. *See* Minute Order (Apr. 15, 2026). On June 23, 2026, defendants' motion to dismiss was granted in part and denied in part, and plaintiff's second motion for a TRO was also granted in part and denied in part. *See Martinez-Andino*, 2026 WL 1801137, at *21. All claims against the Acting Attorney General were dismissed, as were plaintiff's claim of unreasonable delay of agency action, under 5 U.S.C. § 706(1), and plaintiff's *Accardi* claim to the extent that claim relied upon 8 C.F.R. § 292.5(b). *See id.* at *15. At the same time, plaintiff's alleged facts were found to be sufficient to establish subject-matter jurisdiction and state plausible claims for mandamus, violation of his Fifth Amendment rights, and an *Accardi* claim relying upon ICE's own guidance set out in the agency's Performance-Based National Detention Standards ("PBNDS"). *Id.*

Turning next to plaintiff's second TRO motion, the Court found that plaintiff was likely to succeed on the merits of his Fifth Amendment claim. *Id.* at *17. Plaintiff had credibly alleged that he did not understand the voluntary deportation forms he signed or know that he had a choice not to sign them. *Id.* at *16-17. Of equal significance, the forms signed stated that the signor could "change [his] mind" and decide not to voluntarily depart at any time prior to departure by "notify[ing] an immigration officer if [he] change[d] [his] mind," Pl.'s Form I-826, and plaintiff stated that he had repeatedly requested such rescission, but these requests were "ignored or denied," *Martinez-Andino*, 2026 WL 1801137, at *17. Furthermore, plaintiff stated that he had repeatedly requested to speak with his attorney, who on March 31, 2026, had entered an appearance on plaintiff's behalf with ICE. Pl.'s Aff. (Apr. 13, 2026) at 1; Am. Compl. ¶ 28. Plaintiff's counsel

confirmed that she repeatedly requested, from various ICE and CBP offices, plaintiff's location, and that ICE and CBP did not provide her with any information about where he was for the ten days immediately preceding his departure. *Martinez-Andino*, 2026 WL 1801137, at *16; *see also* Chan Decl. ¶ 10. In response to these attestations, defendants merely pointed to plaintiff's signed voluntary departure forms, without providing any explanation for or rebuttal to plaintiff's allegations that his repeated requests to rescind his voluntary departure and to speak with his attorney were ignored and denied. *Martinez-Andino*, 2026 WL 1801137, at *17 (citing Def.'s Reply in Support of Mot. to Dismiss at 6, ECF No. 25). In the face of plaintiff's uncontroverted assertions that the form was not initially signed voluntarily and intelligently, that plaintiff had attempted to assert his entitlement to change his mind, and that plaintiff was deprived of access to retained counsel prior to his deportation, the Court concluded that plaintiff had shown these forms likely did not provide an adequate basis for putting plaintiff on a plane to and leaving him in Honduras on April 10, 2026. *Id.* Since defendants asserted no other basis for removing plaintiff from this country, plaintiff was found likely to succeed in showing that his transportation to Honduras was improper based, at a minimum, on his claim that defendants had hindered his ability to avoid being sent to Honduras by violating his Fifth Amendment rights before sending him to Honduras. *Id.*

Turning to the remedy, the Court concluded that directing defendants to facilitate plaintiff's return to this country was appropriate and within the judicial power to require, but ordering that plaintiff be paroled into the United States was not. *Id.* at *18-19. The Supreme Court recently affirmed that when persons are "improperly sent" to another country, the appropriate remedy is to order that the government facilitate their return so that their case may be processed as it would have been absent the improper removal. *Id.* at *17 (quoting *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025)). Since plaintiff had shown he was likely improperly sent to Honduras, this

was the appropriate remedy here, so that plaintiff's case could be "handled as it would have been had he not been improperly sent" to Honduras. *Id.* (quoting *Abrego Garcia*, 145 S. Ct. at 1018). The Court emphasized that "the relief issued is narrow, with no decision made as to whether defendants might have some legitimate basis for removal of plaintiff other than his 'voluntary' waiver of removal proceedings." *Id.* at *20.

On the other hand, ordering that defendants parole plaintiff into the country (*i.e.*, allow him to be in the United States not in physical detention), pursuant to the Secretary of Homeland Security's parole authority, *see* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(b)(5), was not appropriate, for at least two reasons. *Martinez-Andino*, 2026 WL 1801137, at *19-20. First, parole is entirely left to the discretion of the Secretary of Homeland Security by statute. *Id.* Second, plaintiff had not shown that his *detention* was the result of any of the deprivations of rights alleged in his complaint, only that his *removal* flowed from multiple due process violations. *Id.* at *20. Both of these reasons independently meant that ordering parole was not appropriate. *Id.* Again, this decision was "narrow," "with no decision made as to . . . whether plaintiff might have a basis on which to seek release from the custody of immigration authorities, if detained upon his return to the United States." *Id.*

With these limitations on relief in place, plaintiff had shown a likelihood of irreparable harm, given the risks of physical danger from his abusive father in Honduras that he attested to, and the harm of separation from his three-year-old U.S. citizen child. *Id.* The "defendants ma[d]e no arguments about the equities or the public interest," and "[t]hough the public has an interest in conserving government resources by allowing removals to be final, that interest is not well served by allowing the government to make removals without due process, which then necessitate actions such as facilitating a person's return to this country." *Id.* These factors therefore also cut in favor of plaintiff.

14

Accordingly, plaintiff's motion for a TRO was denied in part, as to his request that he be paroled into the United States, but granted in part by directing defendants to facilitate his return to the United States, in order to restore the status quo in place before the likely legal violations occurred. *See Martinez-Andino*, 2026 WL 1801137, at *18 & n.15 (explaining that "'[t]he status quo is the last *uncontested* status which preceded the pending controversy,' not the immediately 'pre-litigation status quo'" (emphasis in original) (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022))). Defendants were also directed to file status reports every 48 hours explaining the steps taken to facilitate plaintiff's return. TRO at 2. Plaintiff was cautioned that the TRO would last only for 14 days, until July 7, 2026, and the parties were directed to file, by July 3, 2026, a joint status report indicating whether plaintiff would seek a preliminary injunction and proposing a schedule on which to proceed. *Martinez-Andino*, 2026 WL 1801137, at *19 n.16; TRO at 2.

### 3. Defendants' Reports on Efforts to Comply with TRO

Defendants filed the court-ordered reports on June 25, June 29, and July 1, summarizing various administrative steps to effectuate plaintiff's return. *See* Defs.' Status Report (June 25, 2026), ECF No. 29; Defs.' Status Report (June 29, 2026), ECF No. 30; Defs.' Status Report (July 1, 2026), ECF No. 31. On July 3, 2026, the parties requested an extension of time to confer on how this case would proceed, Jt. Status Report (July 3, 2026), ECF No. 32, which request was granted, along with an extension of the TRO until July 10, 2026, *see* Minute Order (July 4, 2026). Defendants, meanwhile, continued to file status reports regarding steps taken to facilitate plaintiff's return. Defs.' Status Report (July 6, 2026), ECF No. 33. On July 8, 2026, plaintiff indicated he intended to seek a preliminary injunction and sought to extend the TRO until the preliminary injunction was briefed, on an expedited schedule beginning July 10, 2026, and ending July 17, 2026, whereas defendant opposed further extension of the TRO and advocated a slightly more

15

extended, though still expedited, briefing schedule, extending from July 10, 2026, to July 22, 2026. Jt. Status Report (July 8, 2026) at 3, 5, ECF No. 34; Am. Jt. Status Report (July 8, 2026), ECF No. 35.

Defendants' proposal was adopted, Minute Order (July 8, 2026), given that plaintiff's first and second TRO motions had been filed nearly three months earlier, and plaintiff had agreed to an extended briefing schedule for his second TRO motion, *see* Jt. Status Report (April 15, 2026) (jointly proposing schedule extending from April 15, 2026, to June 17, 2026), which included an opportunity for him to file a preliminary injunction motion by April 19, 2026, *see* Minute Order (April 15, 2026) (entering parties' proposed schedule).  Neither by April 19 nor during the approximately 17-day duration of the TRO did plaintiff move for a preliminary injunction, notwithstanding the express caution that the TRO would last only fourteen days unless converted to a preliminary injunction or supplemented by a preliminary injunction. *Martinez-Andino*, 2026 WL 1801137, at *19 n.16.  This left no "good cause" to extend the TRO over defendants' objection, as required by Federal Rule of Civil Procedure 65(b)(2).  Minute Order (July 8, 2026).

### 4.  Pending Motion for Preliminary Injunction

When the TRO expired on July 10, 2026, defendants' last status report indicated they had issued a travel letter to plaintiff and "notified DHS personnel in Honduras to coordinate with Plaintiff for the next steps."  Jt. Status Report (July 10, 2026), ECF No. 36.  That same day, July 10, 2026, plaintiff filed the pending motion for a preliminary injunction, seeking the same relief granted in the TRO, namely that defendants facilitate plaintiff's return to the United States and report regularly on their progress in doing so.  *See* Pl.'s Mot.; Pl.'s Mem. in Support of Mot. for Preliminary Injunction ("Pl.'s Mem."), ECF No. 37-1; Pl.'s Proposed Preliminary Injunction Order ("Pl.'s Proposed Order"), ECF No. 37-3.  Notably, in contrast to the second TRO motion, plaintiff did not request, as preliminary relief, parole into the country, only facilitation of his return.  Pl.'s

16

Proposed Order.  This motion for preliminary injunction included a letter from plaintiff, detailing that he feels "destroyed because [he] [can]not be there for [his] daughter, Abi," who is a U.S. citizen, and that he has "talked to her by video each day here in Honduras."  Letter from Pl. (July 10, 2026).  Furthermore, he explains that he has "felt afraid for [his] life since [he] arrived" in Honduras, because "gangs target young men like [him]." *Id.*  He makes no mention of his abusive father, which he had initially stated as a primary reason that he feared being in Honduras.  *Compare id.*, with Pl.'s Aff. (Apr. 13, 2026) at 1 ("I am afraid to be here in Honduras. I suffered a lot of physical abuse by my father when I was a child.").  With this support, plaintiff's motion for preliminary injunction is now ripe for resolution.  *See* Def.'s Opp'n to Pl.'s Mot. for Preliminary Injunction ("Defs.' Opp'n"), ECF No. 38; Pl.'s Reply in Support of Mot. for Preliminary Injunction ("Pl.'s Reply"), ECF No. 39.

## II.     LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  A plaintiff seeking a preliminary injunction "must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "The balance of the equities weighs the harm to [plaintiff] if there is no injunction against the harm to [defendants] if there is," and, when the government opposes the preliminary injunction, "the [government]'s harm and the public interest are one and the same, because the government's interest *is* the public interest," so the third and fourth factors merge.  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)

17

(emphasis in original).  The party seeking a preliminary injunction "carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)).

## III.   DISCUSSION

Plaintiff seeks preliminary injunctive relief on grounds that "[d]efendants violated the core tenets of the Fifth Amendment's Due Process Clause and the Immigration and Nationality Act," resulting in plaintiff being sent to Honduras, Pl.'s Mem. at 6, and that the other requirements for preliminary injunction are met, *see id.* at 7-11.  Defendants adopt their arguments made in opposition to plaintiff's second TRO motion and advance certain new arguments in opposition. *See* Defs.' Opp'n at 1.  Plaintiff's motion is granted for essentially the same reasons that plaintiff's second TRO motion was granted in part.  Each of the preliminary injunction factors are discussed in turn, and defendants' arguments in opposition are considered and rejected.

### A.  Likelihood of Success on the Merits

Likelihood of success on the merits is the "most important" factor, *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014), and the "plaintiff seeking a preliminary injunction must establish" that this factor is met to obtain a preliminary injunction, *Winter*, 555 U.S. at 20.  Whether plaintiff is likely to succeed on his Fifth Amendment due process claim, and whether that entitles him to the order he seeks, are discussed next.

### 1.  Defendants Likely Violated Plaintiff's Due Process Rights, Leading Directly to His Removal

Plaintiff alleges that (1) his initial signing of the voluntary departure forms was not knowing and voluntary; (2) he repeatedly attempted to revoke his agreement to voluntary departure, which was ignored or denied by defendants; and (3) he was denied counsel for the ten days immediately preceding his flight to Honduras, despite repeated requests, hindering his ability

18

to pursue legal remedies to prevent his departure to Honduras.  *See* Pl.'s Aff. (Apr. 13, 2026) at 1. For the reasons explained when deciding plaintiff's second motion for a TRO, each of these grounds likely constitute a violation of plaintiff's Fifth Amendment right to due process, and, considered together, led to plaintiff being put on a plane to Honduras.  *See Martinez-Andino*, 2026 WL 1801137, at *16-17.[4] Defendants challenge the veracity and import of each of these identified violations of plaintiff's due process rights.

As a preliminary matter, defendants argue that "putting the burden on [defendants] to 'refute' Plaintiff's post hoc narrative" about the circumstances of his departure from this country is "inappropriate," and further that "[s]hort of invasive surveillance, it is hard to see how Defendants could prove that Plaintiff never asserted he was afraid to return to Honduras or that he wanted to void his voluntary departure agreement."  Defs.' Opp'n at 4.  This argument about unfairness to defendants in considering plaintiff's allegations overflows with crocodile tears.  To be sure, plaintiff "bears the burden of producing credible evidence sufficient to demonstrate [his] entitlement to injunctive relief," *Workman v. Bissessar*, 275 F. Supp. 3d 263, 267 (D.D.C. 2017); *see also Mazurek*, 520 U.S. at 972, though a preliminary injunction may be granted based on "evidence that is less complete than in a trial on the merits," given the "haste" and "limited purpose" of a preliminary injunction, *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1022-23 (D.C. Cir. 1998) (quoting *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981)).  Indisputably, the burdens of production and persuasion were on the plaintiff at the TRO motion stage and remain with plaintiff at this preliminary injunction motion stage.  While plaintiff meets this burden with

---

[4]    Once again, as in considering plaintiff's second TRO motion, plaintiff's *Accardi* claim for failure to comply with the PBNDS is not considered at the preliminary injunction stage, since his Fifth Amendment due process claim is sufficient to support the preliminary injunctive relief sought.  *See Martinez-Andino*, 2026 WL 1801137, at *16 n.14. The preliminary injunction motion also asserts that defendants' actions violated the INA, without explaining which provision of that law plaintiff believes defendants violated, *see* Pl.'s Mem. at 6, and without asserting any claim under the INA in his operative Amended Complaint, and thus this assertion is not considered.

declarations and statements from himself and counsel, and even information obtained from defendants through a FOIA request, defendants offer no affidavits from any of the many CPB and ICE agents who kept plaintiff in custody for nearly three weeks, let alone any agent present when plaintiff signed the two voluntary departure forms on which defendants rely to establish the legality of their actions.  All those agents are in defendants' direct control and could have been identified and submitted sworn declarations or presented in-person testimony at a hearing.  Defendants' suggestion of unfairness in considering the evidence marshalled by plaintiff, when defendants did not bother, is, bluntly put, chutzpah.

Plaintiff's burden may be met by plaintiff's declarations, considered along with the context and timing of other facts about his arrest, detention, and deportation, and alongside the only countervailing evidence submitted by defendants on this issue—the two signed voluntary departure forms themselves.  Defendants take a blinkered approach that the focus should be solely on the DHS Forms I-826 and I-210 signed by plaintiff, and indeed, those two forms are certainly probative on the issue of whether plaintiff agreed to departure knowingly and voluntarily, but not at all on the issue of whether he was denied the right to change his mind or his right to speak to his attorney.  In short, contrary to defendants' argument, crediting plaintiff's declarations and statements in assessing the totality of the relevant evidence on the current record does not improperly shift the burden to defendants.  *See Ramirez v. ICE*, 310 F. Supp. 3d 7, 26-29 (D.D.C. 2018) (finding plaintiffs "met their burden of showing a likelihood of success" as to claims that ICE considered improper factors when making custodial decisions about noncitizen minor who had recently turned 18, relying upon declarations submitted by plaintiffs circumstantially showing that the correct factors had not been considered); *S. Poverty L. Ctr. v. Dep't of Homeland Sec.*, No. 18-cv-760 (CKK), 2020 WL 3265533, at *29 (D.D.C. June 17, 2020) (relying upon plaintiff's

declarations about conditions at ICE facilities to find likelihood of success on the merits even after weighing these declarations against defendants' countervailing declarations).

### a. Knowing and Voluntary Agreement

Turning to the specific due process violation claims found likely to succeed at the TRO stage and again here, defendants' objections are unavailing.  First, defendants posit that "the nature of the circumstances and specific forms signed by Plaintiff are sufficient to show that a noncitizen has made a voluntary departure that was knowing, considered, and intelligent."  Defs.' Opp'n at 5.  In essence, defendants object to looking beyond the two signed Forms I-826 and I-210 to draw any conclusion other than what those forms state.  Both forms provided by defendants to plaintiff to sign on the day of or day after his arrest, while he was in custody, far from his home in North Carolina, before he may have had an opportunity to speak to his family or an attorney, indeed, do state that plaintiff understood the forms and signed them knowingly and voluntarily.  *See* Form I-826; Form I-210; *see also* I-213 Form (noting plaintiff's residence in North Carolina).

The law is amply clear, however, that in assessing the voluntary and knowing nature of a waiver of rights, the totality of the circumstances and context matter.  The right to due process prior to removal may be waived by, for example, agreeing to voluntary departure, but to be effective that waiver must be knowing, "considered," and "intelligent."  *United States v. Mendoza-Lopez*, 481 U.S. 828, 840 (1987).  The "determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  "[T]he question whether the accused waived his rights 'is not one of form, but whether the defendant in fact knowingly and voluntarily waived the rights,'" based on "the totality of the circumstances."  *Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *see also Moran v. Burbine*, 475 U.S. 412, 421

21

(1986) ("First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."); *accord Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) ("Our precedents . . . place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent.").

Plaintiff presents evidence that he did not understand that he had a choice whether or not to voluntarily depart and was "told the only option [he] had in detention was to sign for the paperwork."  Pl.'s Aff. (Apr. 13, 2026) at 1 ("I did not realize I had other options available to me. The paperwork I signed when I was detained was not explained to me. . . . I would have never signed the paperwork if I knew that I did not need to sign it.").  Furthermore, these allegations that he did not understand either what he was signing or that he had a choice about whether to sign are corroborated by the facts that (1) he told his attorney about his lack of understanding before this lawsuit was ever instituted, *see* Chan Decl. ¶ 4, and (2) that his attorney attested that he had told her this before his attorney had any idea that plaintiff had been transported to Honduras, *see id.* (filed prior to defendants revealing plaintiff had been sent to Honduras).  These indicia of reliability weigh in favor of crediting plaintiff's account.  Conversely, defendants have not, as already noted, submitted declarations on this issue from any agents, such as the agents who also signed the forms or who orally translated the Form I-210, though the forms are each countersigned by defendants' agents.  *See* Form I-826; Form I-210.  Thus, the only information in the record about the circumstances under which these forms were signed is: (1) the forms themselves; (2) plaintiff's statement that he did not understand the paperwork; (3) plaintiff's statement that he was told he had no option but to sign; (4) plaintiff's counsel's corroborating sworn statements; and (5) the

22

context of plaintiff signing the forms less than 24 to 48 hours after his arrest and detention, at which point he had little to no opportunity to consult with counsel.

Defendants double-down on their position that no consideration should be given to the circumstances under which plaintiff signed the two forms, characterizing those circumstances as "extrinsic or parol evidence" and, as such, "must be excluded." Defs.' Opp'n at 6 (quoting *Regan v. Spicer HB, LLC*, 134 F. Supp. 3d 21, 32 (D.D.C. 2015) (quoting *Segal Wholesale, Inc. v. United Drug Serv.,* 933 A.2d 780, 783 (D.C. 2007))). Even assuming that the parol evidence rule in contract law may be invoked here and that this rule applies with equal force to a waiver of rights embodied in an agreement to voluntary departure, this argument fundamentally misunderstands the parol evidence rule, which "presupposes a valid contract" and therefore "does not preclude evidence" "challeng[ing] the validity of the contract itself." *Carter v. Urb. Serv. Sys. Corp.*, 324 F. Supp. 3d 19, 33 (D.D.C. 2018); *see also Africare, Inc. v. Xerox Document Solutions MD, LLC*, 436 F. Supp. 3d 17, 39 (considering "extrinsic evidence . . . 'to establish . . . illegality, fraud, duress, mistake, lack of consideration, or other invalidating cause'" (second omission in original) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 214(d) (1981))). Here, where plaintiff does not dispute the meaning of the terms of the voluntary departure agreement, but rather whether he validly entered the voluntary departure agreement *at all*, the parol evidence rule is simply inapplicable.

At bottom, the existence of the signed Forms I-826 and I-210 is probative as to plaintiff's intent to depart the country voluntarily, but the forms alone are not dispositive where, as here, the circumstances surrounding plaintiff signing the forms call into question whether plaintiff understood what he was signing and the consequences of doing so, and his option to decline to sign. *See Reyes-Sanchez v. Holder*, 646 F.3d 493, 499 (7th Cir. 2011) (considering signed Form I-826 along with circumstances surrounding the signing and evidence of noncitizen's intent to conclude that immigrant had knowingly and voluntarily departed the country); Defs.' Opp'n at 5

23

(citing *Reyes-Sanchez* for proposition that "[c]ourts have indicated that the nature of the circumstances and specific forms signed by Plaintiff are sufficient to show that a noncitizen has made a voluntary departure was knowing, considered, and intelligent."). Crediting plaintiff's assertion, which stands uncontradicted by *any* evidence from defendants—*e.g.*, no declarations have been submitted from any of defendants' agents, such as the agents who were present during plaintiff's detention in multiple facilities, who signed plaintiff's forms, who explained the forms to plaintiff, who translated the forms for plaintiff, or who in any way could rebut or counter plaintiff's attestation that he was told he had no other choice but to sign each of the two forms, *see* Pl.'s Aff. (Apr. 13, 2026) at 1—plaintiff has demonstrated a likelihood of success on his claim that he did not knowingly and voluntarily agree to depart this country.[5]

### b. *Recission of Voluntary Departure*

Second, even if plaintiff's signing of the two voluntary departure forms were knowing and voluntary, plaintiff attests that he repeatedly sought to revoke his agreement to voluntary departure, Pl.'s Aff. (Apr. 13, 2026) at 1, as the voluntary departure form expressly states he was permitted to do until the time of departure by "notify[ing] an immigration officer," Form I-826. This language contained in the Form I-826 is required by Supreme Court precedent, which directs that an "alien must be permitted to withdraw, unilaterally, a voluntary departure request before expiration of the departure period." *Dada v. Mukasey*, 554 U.S. 1, 21 (2008). Defendants highlight

---

[5] Defendants additionally argue that "[p]laintiff claims that he agreed to voluntary departure because he was 'isolated' and 'subject[] . . . to degrading conditions'—specifically, Plaintiff claims to have been 'kept in inhumane conditions—denied access to showers and clean water for nearly two weeks,'" but since plaintiff signed voluntary departure forms on his first one or two days in detention, these allegations regarding the conditions of detention, even if true, cannot be the basis for finding plaintiff's agreement to voluntary departure was less than knowing and voluntary. Defs.' Opp'n at 6 (second alteration in original) (quoting Pl.'s Mem. at 1, 6). Given the timing of plaintiff's signature on the two voluntary departure forms within 24 to 48 hours of his initial detention, defendants' point about a tenuous causal connection between him signing the forms and the difficult or even horrific conditions of detention that subsequently followed for two weeks before he was put on a plane to Honduras, is well taken, though the record is not fully developed about the conditions of the Montana jail or CBP facility where he was initially detained.

that "[v]oluntary departure is an agreed-upon exchange of benefits, much like a settlement agreement," Defs.' Mem. at 6 (quoting *Patel v. Att'y Gen.*, 619 F.3d 230, 234 (3d Cir. 2010) (quoting *Dada*, 554 U.S. at 19)), but this argument does not help their position.  To the extent the two voluntary departure forms amount to a "settlement agreement"-type contract, plaintiff was entitled to receive all the benefits of the bargain laid out explicitly in the forms and required by law, including the right to rescind his initial agreement.

Defendants have provided no evidence or explanation to call into question plaintiff's assertions that he changed his mind and "ask[ed] immigration officers to rescind [his] signature," and that these requests were "ignored or denied."  *See* Pl.'s Aff. (Apr. 13, 2026) at 1.  For instance, defendants have not explained what normally happens when detained noncitizens express to immigration officials requests to revoke any agreement to voluntary departure, nor have defendants submitted declarations from any of defendants' agents involved in plaintiff's arrest, detention, or transportation to Honduras countering plaintiff's attestations that he asked, repeatedly, to revoke his agreement to depart voluntarily and was ignored.  Plaintiff has met his burden of showing, for the purposes of his preliminary injunction motion, that he invoked the provision of the Form I-826 allowing him to revoke his voluntary departure, but to no avail.

To be clear, under *Dada*, plaintiff was entitled to revoke his agreement to depart voluntarily "unilaterally," and he had that right even if his agreement to depart was entirely valid in the first instance.  *Dada*, 554 U.S. at 21 (considering revocation valid even though plaintiff's consent to initial agreement to voluntary departure was uncontested).  Plaintiff's assertions to immigration officials that he wished to revoke his voluntary departure agreement therefore invalidated that agreement as a basis for transporting him to Honduras, leaving defendants without any basis for this action.

25

c. *Deprivation of Counsel*

Third, defendants seek to undercut the veracity and import of plaintiff's allegations that he was kept "in total isolation from established legal counsel," Pl.'s Reply at 5, for 10 days immediately prior to being put on a plane to Honduras. As to the veracity of plaintiff's allegations, defendants argue that plaintiff has "not show[n] Defendants attempted to keep Plaintiff from counsel" and criticize plaintiff's counsel's efforts, as described in her declaration, with defendants stating that she "call[ed] numerous DHS facilities, including many with little apparent relationship to Plaintiff's possible location," including the ICE Office at Raleigh-Durham International Airport and ICE Headquarters. Defs.' Opp'n at 6 (citing Chan Decl. ¶ 10). To the extent this argument is intended to shift onto plaintiff (or plaintiff's counsel) any fault for the lack of communication between plaintiff and his counsel while plaintiff was in defendants' custody, this is not persuasive. Instead, this argument amounts to a verbal version of a shell game that ignores at least three critical facts: (1) that the ICE Detainee Locator did not show plaintiff's location from the time of his arrest and detention to when he was sent to Honduras, leaving plaintiff's counsel without any information about where he might be, *see* Chan Decl. ¶¶ 3, 7, 9; (2) that plaintiff's counsel called ICE offices in multiple cities in Arizona and Washington state, where plaintiff had communicated he expected to be transferred, *see id.* ¶¶ 6, 10, as well as the Montana county jail where plaintiff was initially held, *id.* ¶ 10, and no official was able to say where defendant was located; and (3) that, by plaintiff's unrefuted and undisputed count, he was moved to six different ICE facilities, so plaintiff's counsel could do little more than guess about where he might be located on any given day. Plaintiff was being moved around frequently among defendants' facilities, like a pea in a shell game, with defendants failing to provide any accessible information regarding plaintiff's whereabouts or even which agency, ICE or CPB, had him in custody. Under these circumstances, defendants were in control of the proverbial shells and had custody of plaintiff, as the proverbial

26

pea, and thus are easily held accountable for difficulties in plaintiff's counsel communicating with plaintiff.  Plaintiff's own attestations that he repeatedly requested to speak with his counsel but was "ignored or denied," Pl.'s Aff. (Apr. 13, 2026) at 1, are essentially uncontroverted and unexplained by defendants.

As to the import of plaintiff's allegations about denial of counsel, defendants are dismissive that he even has a right to counsel.  According to defendants, "in immigration proceedings, the contours of an individual's right to counsel [are] defined by statute," pointing to the INA's guarantee that "'[i]n any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.'"  Def.'s Opp'n at 7 (quoting 8 U.S.C. § 1362).  Since plaintiff never went through removal proceedings, defendants imply, this statutory right to counsel was not activated.  Although the statutory right to counsel in removal proceedings may predominate in cases involving deprivation of counsel in immigration cases, courts have recognized a Fifth Amendment due process right to confer with counsel retained at one's own expense prior to departure from the United States, including to discuss steps for challenging an allegedly involuntary and unknowing departure.  *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990) (Fifth Amendment includes noncitizen's "due process right to obtain counsel of their choice at their own expense" during deportation proceedings (citing *Rios-Berrios v. INS*, 776 F.2d 859, 862 (9th Cir. 1985))); *C.J.L.G. v. Barr*, 923 F.3d 622, 631 (9th Cir. 2019) (en banc) (Paez, J., concurring) (collecting case law from that Circuit of Fifth Amendment right to counsel in immigration cases, and clarifying that under those cases the Circuit "do[es] not require a showing of prejudice to grant relief"); *Aguila-Enriquez v. INS*, 516 F.2d 565, 568 (6th Cir. 1975) (considering right to counsel in immigration cases and stating

that "if procedures mandated by Congress do not provide an alien with procedural due process, they must yield, and the constitutional guarantee of due process must provide adequate protection during the deportation process," though concluding due process did not require *appointment* of counsel); *Advocs. for Hum. Rts. v. Dep't of Homeland Sec.*, 820 F. Supp. 3d 789, 803 (D. Minn. 2026) ("Noncitizens' Fifth Amendment right to due process includes both the right to obtain counsel and the right to access counsel."); *see also Powell v. State of Alabama*, 287 U.S. 45, 70 (1932) (citing district court "deportation case" in which "the district judge held that under the particular circumstances of the case the prisoner, having seasonably made demand, was entitled to confer with and have the aid of counsel").

Indeed, ICE's own internal regulations prioritize access to retained counsel even prior to removal proceedings, requiring that "attorneys and other legal representatives" "may visit detainees to discuss legal matters," that "[p]rivate consultation rooms shall be available for these meetings," that facilities "shall permit legal visitation seven days a week" "for a minimum of eight hours per day on regular business days," and that "[e]ven if telephone service is limited to collect calls, the facility must allow detainees to make direct, free phone calls to . . . legal service providers, in pursuit of legal representation . . . as soon as possible after the request, factoring in the urgency expressed by the detainee." ICE, *PBNDS*, Standard 5.4-5.5 (2026), https://www.ice.gov/doclib/detention-standards/2026/nds2026.pdf [https://perma.cc/29YQ-4S2U]. To facilitate attorney-client contact, these regulations also require that when a detainee is transferred to a different facility, "ICE . . . shall . . . notify the attorney of record" "[a]t the time of transfer." *Id.* 7.2(II)(A)(1). These regulations reflect the commonsense principle that in civil immigration contexts, the right to confer with retained counsel of one's choice is an essential component of due process.

This result aligns with the general principle articulated by the Supreme Court that "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., NC*, 452 U.S. 18, 27 (1981) (applying *Mathews* test to find no right to court-appointed and taxpayer-funded counsel in proceedings terminating parental rights); *Al-Hela v. Biden*, 66 F.4th 217, 229 (D.C. Cir. 2023) (en banc) (rejecting argument that "the *Mathews* framework was never intended to apply to deprivations of liberty" and applying test to various procedures used in criminal proceedings for individuals held in Guantanamo Bay); *Rafeedie v. INS*, 880 F.2d 506, 523 (D.C. Cir. 1989) ("[E]ven a manifest national security interest of the United States cannot support an argument that [a noncitizen] is not entitled, as a threshold matter, to protection under the Due Process Clause. Once across that threshold, the calculus of just how much process is due involves a consideration of the Government's interests in dispensing with procedural safeguards." (citing and applying the test from *Mathews*, 424 U.S. at 333)).  Here, all three factors of the *Mathews* test favor finding that noncitizens are entitled to speak with their own, retained attorneys while detained and awaiting an immigration disposition.

As to the first *Mathews* factor—the private interest that will be affected by the official action—plaintiff's interests in this matter are deeply serious: he wants to remain in this country with his family and minor child and to pursue the avenues available to him with his SIJ status to obtain lawful permanent residency, and the choices he made in immigration detention, to believe

what defendants' agents told him as to his only option to sign two documents, led directly to his transportation to Honduras and potentially to other legal consequences for his immigration status. *See Dada*, 554 U.S. at 11-12 (discussing legal consequences of accepting or not accepting voluntary departure); *Reyes-Sanchez*, 646 F.3d at 494 (applying consequences of previous voluntary departure to deny immigration benefits). The second *Mathews* factor—the risk of an erroneous deprivation of such interest and value of procedural safeguards—easily swings in favor of allowing access to retained counsel. Due to the complexity of immigration laws and proceedings, noncitizens risk erroneous deprivation of their status and future plans to adjust their status by making missteps and incorrect choices in how they proceed, and those risks are only heightened when they are detained and access to family or counsel is hindered to counter potentially coercive actions by government agents. Significantly, since the INA dictates that a person may be represented by counsel of their own choice and at their own expense in removal proceedings, 8 U.S.C. § 1362, allowing defendants to deprive noncitizens of access to counsel prior to the commencement of removal proceedings could encourage inducement of noncitizens to accept immigration dispositions that avoid removal proceedings (and therefore statutory entitlement to representation) without access to counsel. Finally, as to the third *Mathews* factor— the fiscal and administrative burdens involved in additional procedural safeguards—the cost to defendants to allow plaintiff to contact his counsel while detained appears minimal. Plaintiff was therefore entitled, under the Fifth Amendment's due process clause, to speak with his retained attorney while in custody. *See Rosen v. NLRB*, 735 F.2d 564, 572 (D.C. Cir. 1984) ("[D]ue process is, at bottom, informed by deep and abiding concerns for fundamental fairness to the party." (citing *Lassiter*, 452 U.S. at 27)).

Plaintiff attests that he invoked his right to rescind his voluntary departure agreement, even without the direct assistance of counsel. Nonetheless, this recission appears to have been ignored

by defendants and was certainly not effectuated since plaintiff was held incommunicado from both his counsel and family for ten days before being put on a plane to Honduras.  *See* Pl.'s Aff. (Apr. 13, 2026) at 1.  If counsel communications had been effectuated by defendants, counsel may well have been able to assist plaintiff in reasserting his recission, seeking a stay of his transportation to Honduras, or otherwise preventing him from being removed without due process.

In the criminal context, the Supreme Court has held that deprivation of counsel is a "structural error," the precise effects of which can be difficult to assess after the fact, *see United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006), and has recognized that the same may be true in civil contexts where the right to counsel stems only from the Fifth Amendment due process clause, not from the Sixth Amendment's right to counsel, *see Powell*, 287 U.S. at 70 (citing district court "deportation case" in which "the district judge held that under the particular circumstances of the case the prisoner, having seasonably made demand, was entitled to confer with and have the aid of counsel" to support proposition that "[i]f in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense").  In short, plaintiff has shown a likelihood of success on his allegation that deprivation of counsel constituted a due process violation resulting in his transportation to Honduras.

* * *

Plaintiff has demonstrated a likelihood of success on his claims that his agreement to depart voluntarily was not knowing and voluntary and that he was deprived of access to retained counsel, while in defendants' custody, despite repeated requests for such access by both plaintiff and his counsel, who was unable to access information about plaintiff's custodial whereabouts.  These due process violations likely hindered his ability to avoid being sent to Honduras.  Furthermore, even

31

setting aside any disputed factual or causal questions about whether plaintiff's consent to voluntary departure was knowing and voluntary or whether deprivation of access to counsel resulted in his removal to Honduras, the uncontroverted record shows that he was entitled to revoke his voluntary departure agreement, that he did so, and that defendants nonetheless relied on his voluntary departure agreement to send him on a government-chartered plane to Honduras without any other due process. Doing so likely violated plaintiff's Fifth Amendment due process rights, meaning that plaintiff has shown a likelihood of success as to this claim.

### 2. Facilitation of Return Is an Appropriate Remedy

Without conceding that any due process violations occurred, defendants vigorously challenge whether the appropriate remedy for any such violations is the facilitation of plaintiff's return to the United States. *See* Defs.' Opp'n at 7-12. As explained when considering plaintiff's second TRO motion, "[w]hen a noncitizen was removed from this country 'without any legal process,' a district court may 'properly require[] the Government to facilitate' the person's return to the United States, and 'to ensure that his case is handled as it would have been had he not been improperly sent to [another country].'" *Martinez-Andino*, 2026 WL 1801137, at *17 (all but first alteration in original) (quoting *Abrego Garcia v. Noem*, No. 8:25-cv-951 (PX), 2025 WL 1024654, at *1 (D. Md. Apr. 4, 2025), then *Abrego Garcia*, 145 S. Ct. at 1018). As already discussed, at a minimum, plaintiff has shown that he was entitled to revoke any voluntary departure agreement he entered, that he did so, and that the voluntary departure agreement was nonetheless used as the sole basis to remove him to Honduras without any other process. Even aside from plaintiff's allegations that his initial agreement to voluntary departure was not knowing or voluntary and that he was deprived of counsel immediately prior to being sent to Honduras, each of which packs substantial independent force in plaintiff's favor, plaintiff has shown that he was "improperly sent" to Honduras and is entitled to have his return facilitated so that his case may be "handled as it

would have been" if defendants had properly honored his recission of agreement to voluntary departure. *See Abrego Garcia*, 145 S. Ct. at 1018. Defendants object to this straightforward conclusion on two main grounds.

First, defendants argue that the proper vehicle to challenge the validity of a voluntary departure agreement based, as here, on alleged involuntariness or on deprivation of access to counsel, is through a petition for review filed in the court of appeals, under 8 U.S.C. § 1252. Defs.' Opp'n at 8 (citing *Aguilar v. ICE*, 510 F.3d 1, 13 (1st Cir. 2007), and explaining that "[b]ecause this right to counsel during removal proceedings is tied to removal, plaintiffs generally must bring claim[s] about denial of the right to counsel through the petition for review process in the court of appeals"). The flaw in this argument is that, while this cited statute channels judicial "review of an order of removal" issued administratively to the appropriate U.S. Court of Appeals, § 1252 is entirely inapplicable here. Defendants did not, and do not claim to have, obtained a removal order or even initiated removal proceedings for plaintiff. Rather, defendants insist that plaintiff departed this country voluntarily. *See S. Poverty L. Ctr.*, 2020 WL 3265533, at *17 (retaining jurisdiction over due process claim that "raise[d] issues addressing access to counsel," despite § 1252, because plaintiffs' "lawyers represent the detained immigrants in proceedings other than removal proceedings"); *cf. Nat'l Immigr. Project of Nat'l Laws. Guild v. Exec. Off. of Immigr. Rev.*, 456 F. Supp. 3d 16, 29 (D.D.C. 2020) (finding access to counsel and due process claims barred in district court when they "arise as a 'part of the process by which . . . removability will be determined'" (omission in original) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (plurality)). When the validity of a voluntary departure agreement is at issue in a later removal proceeding that is subject to the administrative review process limiting judicial review to an appellate court, the purpose is typically to determine the effects of any voluntary departure on later immigration benefits, such as cancellation of removal should the noncitizen return to the United States without

33

authorization, and not, as relevant here, to prevent or remedy a person's allegedly nonconsensual deportation to another country. *See, e.g.*, *Reyes-Sanchez*, 646 F.3d at 498 (validity of voluntary departure agreement affected calculation of continuous presence in United States, which in turn affected eligibility for cancellation of removal after the noncitizen returned to the United States); *Flores-Flores v. Holder*, 441 F. App'x 418, 419 (9th Cir. 2011) (mem.) (same); *Barrera-Quintero v. Holder*, 699 F.3d 1239, 1246-47 (10th Cir. 2012) (same); *Rodriguez-Labato v. Sessions*, 868 F.3d 690, 694 (8th Cir. 2017) (same); *see also* Defs.' Opp'n at 5 (citing each of these cases). That is not the situation here, and thus these cases are inapposite.

Generally, noncitizens do not challenge the validity of their voluntary departure agreements directly—through a petition for review or otherwise—for the simple reason that they are entitled by law to revoke their voluntary departure agreements unilaterally, for any reason or no reason at all, leaving them with little reason directly to challenge the validity of the original agreement. *Dada*, 554 U.S. at 17; *id*. at 21 (stating that an "alien must be permitted to withdraw, unilaterally, a voluntary departure request before expiration of the departure period, without regard to the underlying merits of" any administrative appeal they may pursue as an alternative); *see also* Form I-826 (promising that signor may change their mind at any time prior to departure). Since plaintiff has demonstrated that he likely attempted "unilaterally" to "withdraw" his voluntary departure, *id.*, and defendants refused to honor that withdrawal and proceeded to deport him, defendants directly violated the Supreme Court's edict to allow such unilateral withdrawals, as well as the explicit terms on the Form I-826. *See* Form I-826. Plaintiff was never put before an immigration judge for a disposition appealable to the BIA and then, through a petition for review, to a U.S. Court of Appeals. *See* Pl.'s Aff. (Apr. 13, 2026) at 1 ("I told immigration officials that I was afraid to return to Honduras and I wanted an interview or a hearing with the Judge. My requests were ignored or denied each time.").

34

Defendants may not deport noncitizens based solely on duly rescinded voluntary departure agreements, thereby depriving them of the normal processes available to challenge an involuntary removal, and then assert that the noncitizen should have pursued those same processes prior to being deported. On the contrary, plaintiff has shown that he took all appropriate steps to avoid being sent to Honduras, and defendants sent him there anyway. This is precisely the sort of "improper[]" removal for which the Supreme Court has approved a remedy of facilitation of return, so that the case may be redone and properly handled without the improper removal. *Abrego Garcia*, 145 S. Ct. at 1018. Crucially, U.S. immigration regulations prohibit filing or maintaining administrative challenges before the BIA after a person has departed from this country. 8 C.F.R. § 1003.23(b). Indeed, at this time, plaintiff has absolutely nothing to appeal administratively: he was never ordered removed or otherwise legally transported from the country. Thus, plaintiff's return to the United States is essential for him to obtain administrative due process. Once returned here, defendants may take appropriate and legal steps to resolve his case, and he may respond with appropriate administrative motions.

Second, defendants attempt to draw factual distinctions between other cases where the return of noncitizens has been ordered and the instant case, but those distinctions miss the mark. Defs.' Opp'n at 9-12. For example, as explained when considering plaintiff's TRO motion, *Abrego Garcia*'s reasoning does not require defendants' concession of wrongdoing to find that a noncitizen was removed improperly and that facilitation of return is an appropriate remedy. *Martinez-Andino*, 2026 WL 1801137, at *17 (discussing *Abrego Garcia*, 145 S. Ct. at 1018). Similarly, the differing ways in which noncitizens were improperly removed in other cases do not constrict the universe of situations in which facilitation of return is an appropriate remedy for precisely the same problem here of likely improper removal. For instance, in *J.O.P. v. Department of Homeland Security*, the remedy of facilitating the return of a noncitizen was ordered, when the removal was improper

35

because the noncitizen was a member of a court-certified class, and plaintiffs had shown that his removal violated the settlement agreement entered by the court. 779 F. Supp. 3d 570, 576-77 (D. Md. 2025). This same remedy was ordered in *Zapata v. Mullin*, where a noncitizen was improperly sent to a third country that had not agreed to accept her, in violation of the express terms of the INA. No. 25-cv-1560 (RJL), 2026 WL 1352420, at *1 (D.D.C. May 13, 2026).[6] So too, was this remedy ordered in *D.V.D. v. Department of Homeland Security*, when the government failed to refute a noncitizen's allegation that he had expressed fear of being returned to Mexico, but the government deported him there anyway without appropriate process. 784 F. Supp. 3d 401, 410-11 (D. Mass. 2025). Likewise, in *Grace v. Whitaker*, the government applied an arbitrary and capricious standard to evaluate plaintiffs' asylum claims, and the Court ordered those plaintiffs returned to receive a hearing under the correct standard. 344 F. Supp. 3d 96, 104 (D.D.C. 2018) (Sullivan, J.), *vacated in part on other grounds sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020); *see also L. v. ICE*, 403 F. Supp. 3d 853, 856 (S.D. Cal. 2019) (similar). Regardless of the basis for finding the removal improper, in each case, the same remedy was ordered directing the appropriate U.S. government agencies to facilitate the improperly removed noncitizen's return to the United States.

The recent case of *Orellana Cruz v. Oddo*, No. 26-cv-0284 (SLH), 2026 WL 1650733 (W.D. Pa. June 8, 2026), presents an instructive analog, though its facts, too, differ from the facts of this case. In *Orellana Cruz*, a detained petitioner appeared before an immigration judge for removal proceedings and requested cancellation of removal pursuant to certain statutory provisions, and, though this request was denied, his application for voluntary departure was

---

[6]     Defendants point out that the TRO in *Zapata* was eventually dissolved, Defs.' Opp'n at 12, but this occurred only after the factual record was supplemented to show that the third country had in fact agreed to accept plaintiff, and the removal was therefore not illegal, *see* Mem. Order, *Zapata v. Mullin*, No. 26-cv-1560 (RJL) (D.D.C. June 5, 2026), ECF No. 35, and thus the dissolution of the TRO has no bearing on the propriety of the remedy originally granted.

granted. *Id*. at *1. To allow petitioner to appeal the denial of cancellation of removal, the immigration judge directed that the voluntary departure period "would only begin once Petitioner's appeal is unsuccessful or not timely filed." *Id.* (internal quotation marks omitted). The petitioner appealed to the BIA, but while that appeal was pending, the government transported him to El Salvador, contrary to the immigration judge's delayed grant of voluntary departure until the appeal had concluded, and despite a court order for an individual bond hearing to be conducted as to whether the petitioner should continue being detained. *Id*. at *1-2. The court directed that the government facilitate the return of the petitioner because his voluntary departure agreement was not in effect at the time the government "supervised . . . [the] noncitizen's voluntary departure" directly from detention, and whether plaintiff's appeal had been timely filed was a question for the BIA, not the defendants acting "unilaterally," to decide. *Id.* at *3-4. Although defendants contend that *Orellana Cruz* is distinguishable because a court-ordered bond hearing had been scheduled for the petitioner, Defs.' Opp'n at 11, the reasoning in that case relies almost entirely on the improper timing of the "voluntary" departure relative to the immigration judge's order, *Orellana Cruz*, 2026 WL 1650733, at *3. The removal was improper in *Orellana Cruz* because plaintiff had shown a likelihood that the voluntary departure agreement was not in effect *yet*; in the instant case, removal was improper because plaintiff has shown a likelihood that the voluntary departure agreement, to the extent it was valid, was not in effect *anymore*.

Defendants also critique these cases for relying on a "broad reading" of *Abrego Garcia* that defendants apparently believe is incorrect. Defs.' Opp'n at 9 ("Notably, some of the other cases [cited in this Court's TRO decision] rely on a broad reading of *Abrego Garcia* . . . ."). As already discussed, the remedy of ordering defendants to facilitate the return of an improperly deported or removed noncitizen is not limited to when defendants have admitted error in the removal, but is applicable more broadly, as multiple courts have found. This Court will follow the consensus view

37

that "where the lawfulness of an alien's removal is at issue," "the likelihood of success prong . . . hinges on whether" the noncitizen is likely to show "that removal would be or was unlawful," allowing the court to prevent or reverse a noncitizen's physical removal from the country in order to facilitate the plaintiff benefitting fully from the procedural rights. *Roberts v. Anda-Ybarra*, No. 26-cv-377 (DCG), 2026 WL 1459725, at *1 (W.D. Tex. May 22, 2026) (internal quotation marks omitted) (reading *Abrego Garcia* to allow courts to order the government to "facilitate [a noncitizen's return]" or, in that case, issue a preliminary injunction forbidding removal).

Accordingly, an order directing defendants to continue facilitating plaintiff's return on an expeditious basis, is entirely appropriate and warranted to ensure plaintiff may receive due process prior to removal or any other adverse action.

## B. Irreparable Harm

Plaintiff has already been found to show a likelihood of irreparable harm in consideration of his second TRO motion, *see Martinez-Andino*, 2026 WL 1801137, at *20, but defendants contend that he has "failed to show that he is certain to suffer irreparable harm," Defs.' Opp'n at 14 (capitalization altered). Plaintiff need not show "certain" irreparable harm, but he must show a irreparable harm which is not "too speculative" and is "actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006). "[T]he burden of removal alone cannot constitute the requisite irreparable injury" to justify preliminary relief. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Two forms of irreparable harm alleged by plaintiff were relied upon previously in granting the second TRO: the harm of being separated from his child, and the potential for physical danger in Honduras. *See Martinez-Andino*, 2026 WL 1801137, at *20. Plaintiff now adds on "[r]egular, ongoing violation of constitutional rights," which he argues "constitutes *per se* irreparable harm," and that without the preliminary relief of being returned to this country plaintiff will be unable to "obtain[] judicial review . . . or be[] afforded effective relief,

38

including restoration of immigration status," namely because he may miss his date to apply for lawful permanent residency as permitted by his SIJ status. Pl.'s Mem. at 7. These are sufficient to show a likelihood of irreparable harm.

To start, plaintiff continues to suffer from deprivation of his due process rights because he remains outside the United State following his improper deportation. To reprise, plaintiff was sent to Honduras by defendants based entirely on a voluntary departure agreement, which he has convincingly alleged was likely not knowing and voluntary and, in any event, was likely duly rescinded prior to his departure. Meanwhile, he received no other process, such as a removal proceeding, and was deprived of access to counsel for ten days immediately prior to being sent on a plane to Honduras. Defendants dispute any continuing constitutional deprivations, describing any such deprivation as "complete" because plaintiff now has access to counsel, and thus plaintiff suffers no ongoing constitutional harm. Defs.' Opp'n at 20. Even if defendants are no longer actively denying plaintiff his right to counsel, the denial of that and other due process rights while in defendants' custody is resulting in ongoing deprivations. *See Karem v. Trump*, 960 F.3d 656, 667-68 (D.C. Cir. 2020) (holding that "the precise harm complained of here—a violation of Fifth Amendment due process rights—supported injunctive relief" when plaintiff's allegation was that he had been deprived of a right on an ongoing basis without first receiving due process); *see also Taylor v. Trump*, 823 F. Supp. 3d 17, 40 (D.D.C. 2026) (Kelly, J.) (applying *Karem* to find that procedural due process violations may constitute irreparable harm); *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) ("This injury is certain, because it has already occurred, and is ongoing, because the District has held his car for over a year and has yet to provide plaintiff with any type of hearing. Accordingly, the Court finds this deprivation of plaintiff's constitutional rights constitutes irreparable harm.").

39

Plaintiff was entitled to some form of process before being put on a plane to Honduras. Instead, he received none and continues to suffer the consequences.  Although the D.C. Circuit has counseled that "we do not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because [he] alleges a violation of [his] rights," even when that violation is ongoing, *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024), here, the consequences of the deprivation are real, concrete and harmful to him.  Plaintiff has lived for three months as if he had been forcibly deported or removed from this country, despite having received no process at all. This is an ongoing deprivation of his rights that constitutes irreparable harm.  *See Taylor*, 823 F.3d at 40 (interpreting *Hanson* to mean that a mere allegation of constitutional violations will not constitute irreparable harm, but reading *Karem* to mean that plaintiffs who have shown a likelihood of success on the merits of their claim that they are being deprived of constitutional rights may show irreparable harm from the constitutional violation itself); *see also Lopez-Venegas v. Beers*, No. 13-cv-3972 (JAK), 2013 WL 12474081, at *22 (C.D. Cal. Dec. 27, 2013) (holding that "[t]o the extent" that plaintiffs "have made a showing that they may have been deprived of their constitutional right to a removal hearing," "the continued deprivation of this right through trial constitutes irreparable injury," where plaintiffs had returned to home countries pursuant to contested voluntary departures).  As described *supra* in Part III.A.2, plaintiff's return to the United States is likely necessary for him to receive the pre-removal process he is due, and the preliminary injunction sought is therefore necessary to avoid ongoing irreparable harm.

Plaintiff also claims a likelihood of irreparable harm in the form of physical danger in Honduras.  Of note, plaintiff's original affidavit emphasized that plaintiff is now in the town where he was abused by his father as a child, Pl.'s Aff. (Apr. 13, 2026) at 2, but his more recent letter instead focuses on other physical dangers: "gangs," people approaching him in a store and "ask[ing] for [his] name, who [he] was, where [he] came from, and where [he] lived," and people

40

who are looking for his sister and who "made it clear to [him] that they still intend to find her and due to this, [his] own life is in danger." Letter from Pl. (July 10, 2026) at 1. Overall, he states that "[t]he security situation in Honduras is very bad for young people like [him]." *Id.* Defendants point out that these assertions likely would not suffice to support an asylum claim and that, in any case, this is an improper forum to litigate an asylum claim. *See* Defs.' Opp'n at 17-18. The question, however, is not whether plaintiff would qualify for the more long-lasting benefit of asylum relief, but rather whether he is likely to face risks of physical harm while this case is litigated. Taking his uncontroverted assertions as true, this risk appears to be real and concrete, as plaintiff has asserted "specific, credible threats" of violence since his return to Honduras. *See* Pl.'s Reply at 7.

Plaintiff's assertion of separation from his child is less persuasive. Although separation from a child is irreparably painful, plaintiff explains that he has video calls his daughter every day from Honduras. Letter from Pl. (July 10, 2026) at 1. While video calls are a poor substitute for an in-person parenting relationship, given that plaintiff has asserted no viable basis for release from immigration custody should he be returned to the United States, this makes far from clear whether he would in fact have more contact with his daughter if he obtained the relief sought.

Finally, plaintiff expresses concern that his presence in Honduras would prevent him from taking advantage of any opportunity under the SIJ program to apply for lawful permanent residency. Pl.'s Mem. at 8. Defendants dismiss this concern, explaining that voluntary departure does not automatically revoke SIJ status, Defs.' Opp'n at 19 (citing 8 C.F.R. § 204.11(j)(1) (detailing grounds for automatic revocation and good cause revocation, not including voluntary departure from this country)), and plaintiff may seek advance parole—*i.e.*, permission to enter the country—at the time he becomes eligible to apply for lawful permanent residency, *id.* at 20 (citing 8 C.F.R. §§ 212.5(f), 245.1(a)). At the same time, defendants do not make entirely clear how these

provisions operate together and whether, historically, noncitizens have been allowed to adjust their status from SIJ to lawful permanent residency after physically departing from the country. This uncertainty is understandably of grave concern to plaintiff. Moreover, defendants themselves would have discretion to grant or deny advance parole, *see* 8 C.F.R. § 212.5(a) (emphasizing that parole is "discretion[ary]" and on a "case-by-case basis"), and are currently vigorously contesting the possibility of returning plaintiff to this country, calling into question whether there is any likelihood of plaintiff obtaining relief through advance parole. Despite these uncertainties, plaintiff, who bears the burden of showing irreparable harm, has not shown that he is precluded from using his SIJ status to obtain lawful permanent residency because he is in another country, or what would happen if his date to apply for lawful permanent residency came about while he was abroad. This source of irreparable harm is therefore a somewhat weaker addition to his other strong showings of irreparable harm.

In sum, although some of plaintiff's asserted bases for irreparable harm fall short, he has shown a likelihood—indeed, a certainty—of ongoing irreparable harm stemming from the continued violation of his constitutional rights, and, to a somewhat lesser extent, from the risks of physical violence in Honduras. This factor therefore tips in plaintiff's favor.

## C. Public Interest and Balance of Equities

As support that the "balance of equities tips sharply in Plaintiff's favor," plaintiff reiterates the grounds asserted for a finding of irreparable harm, along with the "loss of gainful employment" he had in the United States and the "denial of freedoms and mobility after escaping a life of violence and insecurity in Honduras." Pl.'s Mem. at 9. Additionally, the public interest is served by ensuring, when defendants pluck a law-abiding, work-authorized, employed noncitizen with a minor American citizen dependent, from the community as part of a civil immigration arrest and detention, that all constitutional and statutory procedural rights of that noncitizen are fully

42

respected and enforced. This means that instead of the noncitizen seemingly disappearing in defendants' custody, with his status and whereabouts unknown, that the noncitizen's requests to communicate with counsel are honored and that counsel is promptly informed of the client's custodial status and whereabouts. This also means that when defendants seek a voluntary removal agreement from a noncitizen, that this process is done lawfully so that the noncitizen is able to make that choice knowingly and voluntarily, and also freely able to revoke the voluntary departure, all while being afforded access to retained counsel. This public interest is definitively not served by allowing to stand government action that appears likely to have subverted these requirements by simply removing the individual despite the lack of a valid voluntary departure agreement, denial of the rescission right, and denial of access to counsel.

On the other side of the scales, defendants rightly highlight that "[t]he Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant." Defs.' Opp'n at 21 (quoting *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981)); *see also Martinez-Andino*, 2026 WL 1801137, at \*20 (noting that defendants made no arguments about the balance of the equities at the TRO stage). Defendants then go off-track to argue that "[i]t is in the public interest that noncitizens properly channel their immigration claims," specifically by challenging removal orders in immigration court, Defs.' Opp'n at 22 (citing 8 U.S.C. § 1252's bar on district court review of removal orders), when no removal order subject to the INA's channeling provisions is at issue in this case.

The equities and public interest cut in favor of plaintiff. Plaintiff has shown a likelihood that defendants' actions did not in fact constitute enforcement of immigration laws at all—instead, as discussed at length *supra* in Part III.A.1(a)-(c), defendants removed plaintiff based on a voluntary departure agreement that likely was invalid and, even if valid, likely had been voided by plaintiff's recission, all while denying access to retained counsel.

43

Defendants additionally argue that granting relief here "opens the floodgate to many noncitizens attempting to undo their agreement to voluntary departures." Defs.' Opp'n at 21. This concern is wholly misplaced on the factual record before this Court. In contrast to defendants' concern, to deny relief here would encourage a practice of forcibly removing noncitizens based on invalid voluntary departure forms, even when duly rescinded, and denying detained noncitizens access to retained counsel. The risk of "opening the floodgate" to such lawless and unlawful government action invited by such encouragement is dangerous, not just for noncitizens but for all Americans as well. The equities therefore tip decidedly in plaintiff's direction.

### D. Scope of Relief

Defendants argue that the relief sought here is excessively "overlap[ping]" with the relief ultimately sought by plaintiff, rendering the relief inappropriate for a preliminary injunction, and further than the relief sought is too broad and "'rather than preserving the status quo, completely changes it.'" Defs.' Opp'n at 22-23 (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808-09 (9th Cir. 1963)). Defendants particularly object to the proposed deadline that plaintiff be returned to the United States by July 31, 2026. *Id.* at 24; *see* Pl.'s Mem. at 11; Pl.'s Proposed Order at 1; Pl.'s Reply at 8.

Although plaintiff's requested preliminary injunctive relief overlaps somewhat with the ultimate relief sought in the Amended Complaint, the latter is far more extensive and includes "reinstating Plaintiff's grant of Deferred Action and his prior immigration status" and a permanent injunction "prohibiting Defendants from further interfering with . . . his right to seek adjustment of status," along with an order for parole into this country. Am. Compl. at 19 (Prayer for Relief). Those latter forms of relief are not sought or discussed at this stage.

Defendants' argument that the injunction sought should be viewed with skepticism because it "completely changes" the status quo, *see* Defs.' Opp'n at 23, misunderstands what the "status

quo" is in this context. "'The status quo is the last *uncontested* status which preceded the pending controversy,'" not the immediately "pre-litigation status quo." *Huisha-Huisha*, 27 F.4th at 733 (emphasis in original) (quoting *District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969))); *see also, e.g.*, *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *7 (D.C. Cir. 2025) (upholding TRO that directed that an officer removed from his position be permitted to perform his duties during the TRO, since that was the status quo before the officer was allegedly illegally removed); *Baillargeon v. CSX Transp. Corp.*, 463 F. Supp. 3d 76, 82-83 (D. Mass 2020) ("[T]he status quo may be determined by looking at the last uncontested status which preceded the pending controversy.'" (quoting *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010))).

To the extent that defendants' view plaintiff's suggestion that defendants be ordered to "immediately" or "by July 31" return plaintiff to this country, *see* Pl.'s Mot. at 1, as overbroad, this Court shares the concern that a deadline would not show "due regard for the deference owed to the Executive Branch in the conduct of foreign affairs." *Abrego Garcia*, 145 S. Ct. at 1018. Nonetheless, defendants' responsiveness to the previous TRO was disappointingly sluggish and the myriad excuses for delay unconvincing. In the seventeen days between entry of the TRO and its expiration, defendants did not even manage to set a travel date for plaintiff or do anything more than issue a letter indicating he could travel back to the United States. Jt. Status Report (July 10, 2026). Under the preliminary injunction ordered herein, defendants are directed to act promptly and expeditiously. Although the Court will not impose a specific deadline for plaintiff's return, defendants will be directed, as plaintiff requests and consistent with the prior TRO, to submit status reports every 48 hours regarding steps taken to facilitate plaintiff's return. If the progress described in these status reports is not satisfactory, or if plaintiff has not been returned to the United States within two weeks, defendants should be prepared to explain, including through testimony at an in-

person hearing, the reason for any delay and their efforts to ensure meaningful compliance with this Court's order. Additionally, defendants should be prepared to provide case processing speed statistics and comparisons to the return of individuals brought back to the United States under the "Government's own well-established policy to 'facilitate [an] alien's return to the United States if . . . the alien's presence is necessary for continued administrative removal proceedings' in cases where a noncitizen has been removed pending immigration proceedings" and their petition for review is granted by a Court of Appeals. *See Abrego Garcia*, 145 S. Ct. at 1019 (Sotomayor, J., respecting the Court's disposition of the application) (citing ICE, Directive 11061.1: Facilitating the Return to the United States of Certain Lawfully Removed Aliens, § 2 (Feb. 24, 2012)); *see also* Directive 11061.1 ("This Directive describes existing ICE policy for facilitating the return to the United States of certain lawfully removed aliens whose PFRs are granted by a U.S. court of appeals or the U.S. Supreme Court.").

### E. Bond

Finally, defendants request the posting of a bond, Defs.' Opp'n at 25, pursuant to Federal Rule of Civil Procedure 65(c), which requires that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." District courts have "broad discretion" whether to order bond. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). Here, no bond will be required. Defendants provide no estimate of the cost to facilitate plaintiff's travels back to the United States, and the prospect of posting bond for a commercial flight and any other of defendants' costs may be prohibitive to plaintiff availing himself of the relief granted.

### IV.   CONCLUSION

46

Plaintiff has satisfactorily met the four factors requisite to obtaining preliminary injunctive relief and, therefore, his motion is **GRANTED.** Defendants are **DIRECTED** to facilitate plaintiff's return to the United States for proper processing of his immigration case, and to submit a report every 48 hours detailing their efforts to do so, until plaintiff is returned promptly and expeditiously to the United States. Defendants' request for bond is **DENIED**.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: July 25, 2026

_____
**BERYL A. HOWELL**
United States District Judge